

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-12-00757-CV

**BOARD OF ADJUSTMENT FOR THE CITY OF SAN ANTONIO, TEXAS**
and Trinity University,
Appellants

v.

Patrick **KENNEDY** Jr., Blair Labatt, Taylor Collins, Dana McGinnis
and Clair Oppenheimer O'Malley,
Appellees

From the 37th Judicial District Court, Bexar County, Texas
Trial Court No. 2012-CI-16640
Honorable Cathleen M. Stryker, Judge Presiding

Opinion by:    Catherine Stone, Chief Justice

Sitting:       Catherine Stone, Chief Justice
               Karen Angelini, Justice
               Rebeca C. Martinez, Justice

Delivered and Filed:  July 3, 2013

REVERSED AND RENDERED

    Although the standard of review governing an appeal is always an important consideration

in any appellate opinion, the standard of review governing this appeal is a critical component of

the decision reached herein.  The Board of Adjustment for the City of San Antonio and Trinity

University appeal the trial court's order granting summary judgment and overturning the Board's

decision which upheld the City's issuance of certificates of occupancy to Trinity.  The certificates

of occupancy allow Trinity to use four houses for administrative offices.  The Board and Trinity

assert that the Board did not clearly abuse its discretion in determining the certificates of occupancy were properly issued based on Trinity's nonconforming use and development preservation rights.

## BACKGROUND

Between 1952 and 1960, Trinity acquired the four houses which are the subject of this appeal. The houses are located on Oakmont Court in the historic Monte Vista neighborhood section of San Antonio, Texas. At the time the houses were acquired, they were located in "A" Single Family zoning, which included single-family dwellings and colleges as permissible uses.

In 2001, the City adopted the Unified Development Code which contained a new zoning matrix and changed the zoning for the four houses (and Trinity's entire campus) to "R-5" Residential. R-5 zoning includes single-family dwellings and public colleges and universities among the permissible uses, but not private colleges and universities. Because Trinity, a private university, was using the houses at the time the new zoning matrix was adopted, Trinity was potentially entitled to nonconforming use rights and development preservation rights with respect to the houses. The parties disagree, however, about the manner in which Trinity was using the houses in 2001.

In 2010, Trinity applied to have the four houses and a fifth house it acquired on Oakmont Court rezoned to R-5S specific use, which would allow Trinity to use the houses for "private university" uses.[1] Specifically, Trinity wanted to use the houses for administrative offices. After reviewing the application, the City's staff issued a report which referenced Trinity's nonconforming use and development preservation rights. When controversy with the Monte Vista

---

[1] Trinity's attorney explained that rezoning was required because the fifth house, which was not acquired until 2010, was not entitled to nonconforming use rights. In addition, Trinity's attorney explained that rezoning is generally preferred to reliance on nonconforming use rights, even though rezoning is not required.

homeowners arose regarding the application, Trinity subsequently withdrew the rezoning application (which would have required a public hearing) and applied for certificates of occupancy to use the four houses for offices. The City issued the certificates of occupancy, and the Monte Vista Homeowners Association and numerous homeowners appealed to the Board. A settlement was reached between Trinity and the homeowners association; however, five homeowners, the appellees in this appeal, continued to pursue the appeal. The Board did not vote to overturn the City's decision.[2]

The five homeowners then filed a petition with the trial court challenging the Board's decision. After the trial court granted a writ of certiorari and the Board filed its return, competing motions for summary judgment were filed. The trial court granted the motion filed by the five homeowners, thereby overturning the Board's decision.

### STANDARD AND SCOPE OF REVIEW

A decision of a board of adjustment may be challenged by the filing of a petition in district court stating that the decision of the board is illegal in whole or in part and specifying the grounds of the illegality. TEX. LOC. GOV'T CODE ANN. § 211.011(a) (West 2008); *Town of Bartonville Planning & Zoning Bd. of Adjustments v. Bartonville Water Supply Corp.*, No. 04-12-00483-CV, 2013 WL 2558272, at *6 (Tex. App.—San Antonio Mar. 27, 2013, no pet. h.); *City of Alamo Heights v. Boyar*, 158 S.W.3d 545, 549 (Tex. App.—San Antonio 2005, no pet.). "On the presentation of the petition, the court may grant a writ of certiorari directed to the board to review the board's decision." TEX. LOC. GOV'T CODE ANN. § 211.011(c). If a writ is granted, the board must file a return concisely stating "any pertinent and material facts that show the grounds of the decision under appeal." *Id*. at § 211.011(d).

---

[2] At least nine votes were needed to overturn the City's decision. The Board's vote was 5-5.

"The district court sits only as a court of review, and the only question before it is the legality of the [board of adjustment] order." *City of Dallas v. Vanesko*, 189 S.W.3d 769, 771 (Tex. 2006); *see also City of Alamo Heights*, 158 S.W.3d at 549. "The board's order is presumed to be legal, and the party attacking the order has the burden of establishing its illegality." *City of Alamo Heights*, 158 S.W.3d at 549. To establish that the board's order is illegal, "the party attacking the order must present a very clear showing of abuse of discretion." *City of Dallas*, 189 S.W.3d at 771; *see also City of Alamo Heights*, 158 S.W.3d at 549. The board abuses its discretion if it acts without reference to any guiding rules and principles or clearly fails to analyze or apply the law correctly. *City of Dallas*, 189 S.W.3d at 771; *City of Alamo Heights*, 158 S.W.3d at 549.

With regard to factual matters, the reviewing court must not put itself in the position of the board and substitute its findings for those of the board, even if the overwhelming preponderance of the evidence is against the board's decision. *City of Dallas*, 189 S.W.3d at 771; *Christopher Columbus Street Market LLC v. Zoning Bd. of Adjustments of the City of Galveston*, 302 S.W.3d 408, 416 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *City of Alamo Heights*, 158 S.W.3d at 549. A party attacking the legality of the board's order must establish that the board could reasonably have reached but one decision, and not the decision it made. *City of Dallas*, 189 S.W.3d at 771; *Christopher Columbus Street Market LLC*, 302 S.W.3d at 416. A board does not abuse its discretion "if it bases its decision on conflicting evidence and some evidence supports its decision." *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998); *see also Christopher Columbus Street Market LLC*, 302 S.W.3d at 416.

Whether a board of adjustment abused its discretion is a question of law for the trial court. *City of Alamo Heights*, 158 S.W.3d at 549. This court reviews a trial court's decision on a question of law de novo. *Id.* "When both sides move for summary judgment, as they did here, and the trial court grants one motion and denies the other, reviewing courts consider both sides' summary-

- 4 -

judgment evidence, determine all questions presented, and render the judgment the trial court should have rendered." *Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010).

## NONCONFORMING USE

Section 35-701 of the Unified Development Code ("Code") contains the following statement of purpose:

> The purpose of this division is to protect the rights of property owners who have lawfully established, and continuously maintained in a lawful manner, a use prior to the adoption of this chapter or prior to any amendment to this chapter which would otherwise render such use unlawful.

In furtherance of this purpose, Section 35-702(b)(1) states, "The lawful use of land existing as of the effective date of this chapter … may be continued as provided in this section." Section 35-702(a)(2) defines nonconforming use, in pertinent part, as "any use which [on] the effective date of the ordinance from which this chapter is derived was lawfully operated in accordance with the provisions of said ordinance but which use, by reason of amendment to said ordinance, or other governmental action, is not a permitted use in the district in which the use is located."

A.   Nature of Use in 2001

At the hearing before the Board, the Monte Vista homeowners who testified in favor of overturning the City's decision consistently testified that the four houses had always been used as faculty residences.[3] Testimony was also presented to the contrary. Trinity's president testified that the houses had been used for "a variety of university uses since 1960, including housing for faculty and staff, offices, student accommodation, receptions, and accommodation for university visitors and a conference center." Hugh Daschbach, a university alumni and ex-employee,

---

[3] The homeowners also relied on tax records appraising the houses as residences and Trinity's registration of its campus property, but not the four houses, as a nonconforming use.

- 5 -

testified, "as an employee of the university in the mid to late 1990s, I was in an office that had been relocated temporarily into one of the houses here in question." In response to a question, Daschbach clarified that the house had been used as a residence by Reverend Judd, but the space was turned into an office after Reverend Judd moved out. Daschbach explained, "the master bedroom was the director's office. A bedroom was something else, a conference room." Dr. Mark Brodl, a Trinity professor, testified, "I, as a faculty member, have gone to those houses, even when they're lived in as a residence by an administrator or by an associate vice president. They are used for receptions. There are lectures that take place in those houses. …. It's not your typical residential type of use." With specific reference to the four houses, Dr. Brodl stated that the houses were used as residences "and also had, as I had suggested, multiple functions." In response to whether the houses were used as a "combination of both residence and doing business, sort of like a home occupation," Dr. Brodl responded, "Yeah."[4]

Accordingly, the evidence presented to the Board regarding the nature of the use in 2001 was conflicting. As previously noted in discussing the applicable standard of review, a board does not abuse its discretion "if it bases its decision on conflicting evidence and some evidence supports its decision." *In re Barber*, 982 S.W.2d at 366; *see also Christopher Columbus Street Market LLC*, 302 S.W.3d at 416. Moreover, a reviewing court cannot substitute its findings for those of the board, even if the overwhelming preponderance of the evidence is against the board's decision. *City of Dallas*, 189 S.W.3d at 771. Therefore, in this case, the Board would not have abused its discretion in finding that the four houses were used exclusively as faculty residences; however,

---

[4] In addition to the testimony, evidence was also presented that City Public Service provided commercial electric rates to the houses and San Antonio Water System included the houses in Trinity's commercial property recycled and reclaimed water program.

the Board also would not have abused its discretion in finding that the four houses were used for offices.

B.      Was the use "lawful" absent prior certificates of occupancy?

The homeowners contend that if the property was being used for anything other than faculty residences, the use was not "lawful" because Trinity did not obtain certificates of occupancy that would be required for any other use.  In order to meet the definition of nonconforming use, the use must be a lawful use.  As described in Section 35-701 of the Code, the use must be "*lawfully* established, and continuously maintained in a *lawful* manner." (emphasis added).  Moreover, Section 35-702(b)(1) states the "*lawful* use of land … may be continued." (emphasis added).  Finally, Section 35-702(a)(2) of the Code defines a nonconforming use as any use which was "*lawfully* operated." (emphasis added).  Therefore, we agree with the homeowners that the use in question must have been lawfully established, operated, and maintained in order for Trinity to be entitled to nonconforming use rights.

Section 35-401(d)(1) requires a certificate of occupancy to be obtained for the uses, including nonconforming uses, for which the International Building Code requires such a certificate.  Section 304.1 of the International Building Code requires certificates of occupancy for a "Business Group B" occupancy which "includes, among others, the use of a building or structure, or a portion thereof, for office, professional or service-type transactions."  Section 304.1 states that "business occupancies" include "[e]ducational occupancies above the 12th grade."  Section 35-424(b) also states, "A certificate of occupancy shall not be required for a single-family dwelling unit, a child care facility which does not require a state license, or a home occupation."

We again refer back to the applicable standard of review.  As noted, "[t]he board's order is presumed to be legal." *City of Alamo Heights*, 158 S.W.3d at 549.  The board abuses its discretion if it acts without reference to any guiding rules and principles or clearly fails to analyze or apply

the law correctly. *City of Dallas*, 189 S.W.3d at 771; *City of Alamo Heights*, 158 S.W.3d at 549. In this case, the Board would have been guided by the requirement that Trinity would have needed a certificate of occupancy if it was using the four houses for "[e]ducational occupancies above the 12th grade," but not if it was using the four houses for single-family dwelling units. Because the Board did not overturn the City's decision, the Board must have believed the testimony that the four houses were being used as faculty residences and not for other purposes that would have required a certificate of occupancy. As previously noted, a finding by the Board that the houses were used as faculty residences would not be an abuse of discretion. *See In re Barber*, 982 S.W.2d at 366; *Christopher Columbus Street Market LLC*, 302 S.W.3d at 416.

C.      College Use

The next issue that arises is whether Trinity's use of the four houses for faculty residences entitled it to nonconforming use rights in 2001. For the reasons set forth below, we hold that Trinity's use of the houses for faculty residences was a "college" use as that term is used in the zoning ordinances. It is important to note, however, that the Board must have determined that the use of the houses as faculty residences was a residential occupancy and not an educational occupancy for purposes of the certificate of occupancy requirements. We believe the law supports such a finding because when a residence is used as a faculty residence, and thereby encompassed within the definition of "college" use as discussed below, the residence still can remain a single-family dwelling unit for occupancy purposes. Under those circumstances, the use of the residence by a faculty member is a "college" use; however, the faculty member occupies the residence as a single-family dwelling unit.

"Courts use the same rules that are used to construe statutes to construe municipal ordinances." *Bd. of Adjustment of City of San Antonio v. Wende*, 92 S.W.3d 424, 430 (Tex. 2002). Thus, we consider "the plain meaning of the words of the provisions." *Id*.

Although the homeowners challenge the Board's reliance on out-of-state cases to support its definition of "college," asserting no Texas case has ever cited those authorities, the appellees do not offer authority to support a different definition. This court may certainly consider decisions of other state courts in formulating an opinion even if those decisions are not binding precedent. *Williams v. Cimarron Ins. Co.*, 406 S.W.2d 172, 175 (Tex. 1966); *Roe v. Ladymon*, 318 S.W.3d 502, 510 n.5 (Tex. App.—Dallas 2010, no pet.).

In *Anderson v. Associated Professors of Loyola College*, 385 A.2d 1203 (Md. Ct. Spec. App. 1978), *cert. denied*, 283 Md. 729 (Md. 1978), a fact pattern similar to the instant case was considered. Loyola College acquired two houses adjacent to its campus. *Id*. at 1203. One of the houses was used as a residence and office of the college president. *Id*. The second house was used for administrative offices. *Id*. Neighbors in the area complained to the zoning board which held a hearing and decided the use of the house for the president's residence was a proper use, but the use of the house for administrative offices was improper. *Id*. at 1203-04. The board's decision was appealed to the city court which decided both uses were proper. *Id*. at 1204. The city court's decision was then appealed to the Court of Special Appeals of Maryland. *Id*.

The Maryland court noted that "colleges" were included in the uses permitted in a residence district by the governing zoning ordinance. *Id.* The court then noted, "What is not so clear is what is meant by 'colleges'?" *Id.* The court then reasoned:

> A college is more than its classrooms, laboratories, and study halls. It is an undertaking that involves, in today's world, athletic fields, gymnasiums, libraries, faculty and student lounges, school newspaper offices, administrative offices, chapels, and oftentimes faculty residences. A residence for the president of the institution is not unusual.

*Id*. at 1205. The court further reasoned, "Administrative offices are also an essential part of the educational process. Without them, it is doubtful that a college could long exist." *Id*. The court then held the use of both houses was permissible as a "college" use. *Id*. at 1206.

We agree with the Maryland court's definition of "college" use and hold that a faculty residence is encompassed within a "college" use of property just as the use of property for college administrative/faculty offices is a "college" use. Because the use of the four houses as faculty residences is considered a "college" use, Trinity's use of the houses for this purpose entitled it to nonconforming use rights when the Code was adopted in 2001.

D.      Registration of Nonconforming Use

The homeowners also contend that Trinity lost its entitlement to nonconforming use rights by failing to register its rights with regard to the four houses. We disagree.

Section 35-705 of the Code is entitled "Certificate of Nonconforming Use." Section 35-705(a) provides, "The owner of a nonconforming use or structure may register such nonconforming use or structure by filing with the department of development services a registration statement." Section 35-705(c) states, "The owners of a use or structure which is rendered nonconforming as a result of the adoption of this chapter shall have three (3) years from the effective date of this chapter to register such use or structure. … Provided, however, that after the time periods prescribed above, nonconforming rights may be established only upon submission by the owner of sufficient evidence for the director of development services to find that the use or structure existed prior to the date of rezoning and was in legal compliance with all applicable laws." Section 35-705(d), which is entitled "When Registration Not Required," states, "It is not required to register a use or structure that is made nonconforming by any governmental action other than annexation or rezoning."

We agree with the Board that Section 35-705 makes registration of nonconforming uses permissible, but not required. Section 35-705(a) clearly states, "the owner … *may* register" the nonconforming use. Moreover, the "Provided, however" sentence in section 35-705(c) supports the contention that if the nonconforming uses are not registered within the three years, they still

- 10 -

can be established later. Finally, we agree with the Board that the adoption of the Code was not an annexation or rezoning; thus, registration was "not required" pursuant to Section 35-705(d).

In their supplemental brief, the homeowners argue that the City staff's rule interpretation decision # 107 supports their contention that registration was required within three years. We disagree. Although the rule interpretation decision does state that registration is required before a non-conforming use can be extended throughout a building under section 35-702(b), the decision does not state that registration must have occurred within three years from the adoption of the Code. Instead, the decision simply recognizes that the nonconforming use must be registered prior to expansion to verify the pre-June 4, 2001 use. As the "Provided however" language in section 35-705(c) establishes, nonconforming uses can be established after the three year period by submitting sufficient evidence to the director of development services.

Accordingly, because registration of nonconforming uses was permissible but not mandatory in the three-year period after the adoption of the Code, Trinity was not required to register the nonconforming use of the houses within the three-year period in order for their "college" use of the houses as faculty residences to be lawful.

## DEVELOPMENT PRESERVATION RIGHTS

Section 35-D101(c) states:

> Land uses legally existing as of the effective date of this chapter which do not conform with the uses permitted in the new district to which they have been placed shall have development preservation rights (DPR) pursuant to article VII, division 1 of this chapter. Existing uses meeting this criterion shall be eligible to obtain building permits for rebuilding and expansion if said use was legally operating within the past twelve (12) months at the time of application for said permit.

As previously discussed, Trinity's use of the houses as faculty residences was a "college" use. Similarly, the use of the houses as administrative offices also would be a "college" use. Therefore, the use would be a continuing use. Even if the use of the houses as offices is considered a change

- 11 -

in the "college" use, Trinity's development preservation rights would permit an expansion of that use.

## CONCLUSION

In accordance with the applicable standard of review, we conclude the Board could have determined that Trinity's use of the four houses as faculty residences in 2001 was a "college" use that did not require a certificate of occupancy or registration in order for the use to be lawful. Because Trinity was entitled to use the houses for "college" uses and the use of the houses for offices is also a "college" use, the Board's order is not illegal. Accordingly, we reverse the trial court's judgment and render judgment affirming the Board's decision.

Catherine Stone, Chief Justice