

# NUMBER 13-16-00440-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

JOHN SCHACK AND DEBBIE SCHACK,                          Appellants,

v.

PROPERTY OWNERS ASSOCIATION OF
SUNSET BAY AND TIMOTHY RAUB,                          Appellees.

### On appeal from the 343rd District Court
### of Aransas County, Texas.

# OPINION

### Before Justices Rodriguez, Longoria, and Hinojosa
### Opinion by Justice Rodriguez

Appellants John and Debbie Schack filed suit, seeking to prevent their neighbor, appellee Timothy Raub, from renting his house out on a short-term basis to vacationers. The Schacks argued that Raub's rental operation was barred by certain real property covenants and restrictions. The Schacks also sued appellee Property Owners

Association of Sunset Bay (the "POA") for not preventing Raub from renting his house. The jury returned a verdict in favor of Raub and the POA. By ten issues, the Schacks appeal. We affirm.

## I.    BACKGROUND

The Sunset Bay subdivision is located in Aransas County, Texas. Raub bought a tract of land in Sunset Bay in 2007 ("the Property"). The Schacks bought an adjacent tract in 2010. Both lots were subject to a set of real estate covenants for the Sunset Bay subdivision which is called Sunset Bay's Declaration of Covenants, Conditions, and Restrictions ("the Declaration"). This appeal primarily stems from disagreements among the parties about the proper interpretation of the Declaration—in particular, whether the Declaration forbids Raub from renting out his house to vacationers on a short-term basis.

In January 2012, Raub began constructing a three-story, seven-bedroom house on his tract. According to the testimony of Raub and his wife Rosa, their intention was to rent the Property to groups of vacationers, and they would maintain their permanent residence in nearby Portland, Texas. Raub testified that he bought the Property as an investment, both for the purpose of making profit and claiming tax deductions. The Schacks have not built a house on their tract, which remained vacant at the time of trial.

Raub testified that in April of 2012, he posted the Property to the website "Vacation Rental By Owner," or VRBO.com, to advertise its availability. The Property was completed in August 2012, and the next month, Raub began renting it out on a short-term basis. Raub testified at trial that his guests' typical length of stay was between three and seven days. The rentals continued throughout the following year.

2

On June 19, 2013, the Schacks sent a letter to the POA's president contending that Raub's rentals violated the Declaration. In particular, the Schacks argued that short-term rentals were prohibited by the following italicized passages from the Declaration:

> Permitted Uses. The Property described above, together with any tracts subsequently added by the Declarant as aforesaid, *are intended for one single family dwelling unit per "Lot" and their use is restricted to that purpose*. . . . *Occupancy of a Lot shall be limited to one (1) family*, which shall be defined as any number of persons related by blood, adoption or marriage *living* with not more than one (1) person who is not so related *as a single household unit,* or no more that [sic] two (2) persons who are not so related *living together as a single household unit. . . . No commercial enterprise of any sort shall be situated on any tract* included therein unless the Declarant chooses, in his sole discretion, to designate a tract commercial.

(Emphasis added).

The POA initially expressed similar concerns that Raub's rental operation violated the Declaration, and in August 2013, it sent a letter instructing Raub to stop leasing the Property to short-term renters. However, in fall of 2013, the POA reversed course and took the position that short-term rentals did not violate the Declaration. In November 2013, the POA's board of directors went so far as to adopt an "Interpretation and Clarification" of the Declaration, in which the board stated its belief that short-term rentals did not constitute a prohibited "commercial enterprise." However, no formal amendment to the Declaration was adopted by the POA.

Around the same time, Raub modified his rental agreement to include a notice that "only groups that are classified as a single family in accordance with [the Declaration] can rent our house." Similar to the Declaration, the rental agreement defined a single family as "any number of persons related by blood, adoption or marriage plus any one person not so related . . . ." Raub testified that if he learned that a group of renters did not

3

consist of a single family, he would not rent the Property to them. The rental agreement also prescribed that the "premises shall be used for residential purposes only."

In December of 2013, the Schacks filed this suit against Raub and the POA. The Schacks claimed that Raub's rental operation violated three key restrictions in the Declaration: (1) its provision restricting use of the Property to the "purpose" of "one single family dwelling unit per 'Lot'"; (2) its limitation that the Property may be occupied only by a family or, at most, two unrelated persons "living together as a single household unit"; and (3) its prohibition against any "commercial enterprise." The Schacks asserted that in light of these three restrictions, the Declaration unambiguously prohibited Raub from running a short-term rental operation on the Property, which the Schacks likened to a hotel. The Schacks further alleged that the POA had a duty to stop Raub from renting his property in violation of the Declaration.

Raub moved for summary judgment and the Schacks moved for partial summary judgment on the issue of whether Raub's rental violated the Declarations. The trial court denied the motions.

On April 5, 2016, the parties proceeded to a seven-day jury trial and presented evidence concerning Raub's operation. According to a VRBO advertisement that Raub posted in 2014, the Property was described as a "vacation rental" which accommodated up to twenty-five over-night guests. The Property offered a fishing pier and access to vacation amenities such as boating, bird watching, and other local attractions. The VRBO page also described the Property's amenities—such as a jacuzzi, two full kitchens, wifi, and five flat-screen televisions—and explained that the Raubs provided guests with

"everything you might need for your stay," including linens, towels, dinnerware, etc. Raub's VRBO advertisement did not mention that occupancy of the Property was to be limited to one family or two unrelated persons living together as a single household unit. As to pricing, the page offered the Property for daily rates between $350 and $700 depending on the date, or weekly rates between $2,400 and $3,500, with higher rates in the summer and on major holidays, plus taxes and a $150 cleaning fee.

Raub incorporated similar rate information in his rental agreements with guests. The agreements described two groups of parties: the guests and the "landlords," which were Raub, Rosa, and Raub Properties, LLC. The agreements prescribed check-in and check-out times, and they arranged for housekeeping. The agreements had renters acknowledge their status as guests under the innkeeper statute. The jury heard testimony that Raub had paid hotel occupancy taxes since he began renting the property in 2012.

The jury also heard testimony concerning witnesses' subjective interpretation of the Declaration. Most notably, the jury heard testimony from Richard Gaul, who developed the subdivision. Gaul testified that he never intended to prevent short-term rentals within the subdivision, and he did not believe that any clause in the Declaration restricted Raub from renting out the Property. He testified that if he had intended to restrict short-term rentals, he would have specifically said so in the restrictions. Gaul explained that in other subdivisions he developed, homeowners regularly rented their homes in a similar fashion, despite similar restrictions.

5

At the conclusion of trial testimony, the trial court held a charge conference. The Schacks' first proposed jury question would have asked the jury whether Raub's use violated the restriction that the Property was "intended for one single family dwelling unit per 'Lot' and their use is restricted to that purpose," which we will hereafter refer to as the "Dwelling Restriction." The trial court rejected the proposed question. The court explained its view that the Dwelling Restriction was unambiguous and referred only to the types of structures that could be erected on a lot—i.e., one single family dwelling unit per lot. And because it was undisputed that the Property qualified as a single-family dwelling rather than a multi-unit structure, the trial court did not believe this was a question for the jury.

The Schacks' first proposed question would have also asked the jury if Raub's rental operation violated the restriction providing that "Occupancy of a Lot shall be limited to one (1) family, which shall be defined as any number of persons related by blood, adoption or marriage living with not more than one (1) person who is not so related as a single household unit, or no more than two (2) persons who are not so related living together as a single household unit," hereafter the "Occupancy Restriction." The proposed question would have also instructed the jury on the meaning of the term "dwelling" and "household," with quotations from Texas case law.

In rejecting the question, the court explained its view that the Occupancy Restriction was unambiguous and would be violated only if the Schacks adduced evidence that Raub had actually rented the Property to groups not composed of one "family" or two unrelated persons. The trial court explained that because the Schacks

6

had not produced any evidence that Raub actually rented to non-families, this question should not go to the jury.

However, the trial court submitted a jury question concerning whether Raub's use violated the restriction that "No commercial enterprise of any sort shall be situated on any tract," hereafter the "Commercial Enterprise Restriction." The jury found that Raub did not violate the Commercial Enterprise Restriction.

The trial court also submitted jury questions concerning the POA's actions, which we discuss later.

Based on the jury's verdict, the trial court entered judgment for Raub and the POA. As relevant to this appeal, the judgment incorporated a declaration that Raub's short term rental operation did not violate the Declaration, and the judgment awarded attorney's fees to Raub and the POA on the basis of their claims for declaratory relief. The Schacks appeal.

## II.    THE DWELLING RESTRICTION AND THE OCCUPANCY RESTRICTION

"Sharing and bartering housing resources is not new"; some commentators have cited temporary housing arrangements used by Dutch merchants coming to the New World as early as the seventeenth century as precedent for short-term rentals in America. Jamila Jefferson-Jones, *Airbnb and the Housing Segment of the Modern "Sharing Economy": Are Short-Term Rental Restrictions an Unconstitutional Taking?*, 42 Hastings Const. L.Q. 557, 561 & n.17 (2015) (editorial marks omitted). What is new is the Internet's role in reinventing this practice, which has brought with it an influx of disputes over the legitimacy of short-term home rentals under restrictive covenants.

7

Rachael Ann Neal Harrington, *Vacation Rentals: Commercial Activity Butting Heads with CC&Rs*, 51 Cal. W.L. Rev. 187, 192 (2015).

Our supreme court recently resolved one such dispute in favor of a short-term renter. *Tarr v. Timberwood Park Owners Ass'n, Inc.*, __S.W.3d__, __, No. 16-1005, 2018 WL 2372594, at *1 (Tex. May 25, 2018). In *Tarr*, the court offered guidance on the proper interpretation of restrictive covenants, as applied to short-term rentals. *Id.* at *5.

By their first and second issues, the Schacks' contend that Raub's short-term rental operation violated the Dwelling Restriction and the Occupancy Restriction. Thus, our first task is construing these restrictive provisions in light of recently-issued and controlling precedent. *See id.*

## A. Standard of Review and Applicable Law

We review a trial court's interpretation of a restrictive covenant de novo. *Id.* at *3. "The ownership of land, when the estate is a fee, carries with it the right to use the land in any manner not hurtful to others; and the right to lease it to others, and therefore derive profit, is an incident of such ownership." *Calcasieu Lumber Co. v. Harris*, 77 Tex. 18, 22 (1890). Covenants restricting the free use of land are not favored by the courts, but will be enforced if they are "clearly worded" and confined to a lawful purpose. *Wilmoth v. Wilcox*, 734 S.W.2d 656, 657 (Tex. 1987); *Jennings v. Bindseil*, 258 S.W.3d 190, 194–95 (Tex. App.—Austin 2008, no pet.). However, we may not, through the exercise of construing a vague covenant, bring into existence any restriction of which the property owner did not have notice, *Tarr*, 2018 WL 2372594, at *8, for if one purchases for value without notice, he takes the land free from the restriction. *Id.* at *5.

8

We must examine the covenants as a whole in light of the circumstances present when the parties entered the agreement. *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998). Our primary task is to determine the drafter's intent from the instrument's language. *Wilmoth*, 734 S.W.2d at 658. The words and phrases used in the covenant will be given their commonly accepted meaning. *Id.* at 657–58.[1]

## B.     Construction

### 1.     The Dwelling Restriction

The Dwelling Restriction provides that the Property is intended for "one single family dwelling unit per 'Lot'" and its use is restricted to that "purpose." The trial court found that this restriction referred only to the types of structures that could be erected on Raub's lot. The Schacks dispute this finding and insist that this restriction might also refer to the uses that occupants might make of those structures—i.e., the types of activities that the owner or occupant might conduct within the structures.

In discerning the drafters' intent, courts must consider whether the covenant's restrictions apply to the use of the building or to the nature of the physical structure to be erected on the property. *Tarr*, 2018 WL 2372594, at *9. Courts have often distinguished between use restrictions and structural restrictions and have declined to conflate the two. *Id.*

---

[1] In *Tarr*, our supreme court discussed the common law strict approach to construing real covenants, the statutory liberal approach, and the thirty-year morass in which Texas courts have struggled to determine which of the two interpretive rules should control in a given situation. *See Tarr v. Timberwood Park Owners Ass'n, Inc.*, __S.W.3d__, __, No. 16-1005, 2018 WL 2372594, at *6–7 & n.5 (Tex. May 25, 2018). We need not revisit this topic, for as in *Tarr*, our construction of the Declaration would be the same no matter which interpretive rule controlled.

9

In determining whether a use restriction or a structural restriction was intended, "we cannot ignore" the restriction's specific wording and the context in which these limitations are imposed. *Id.* at *10. In *Tarr*, the court construed the restrictive phrase "a single family residence" and found it instructive that the language surrounding this phrase referred solely to the types of "building[s]" that "may be erected." *Id.* at *9. Relying on context, the court concluded that this was solely a structural restriction. *Id.* at *10. Similarly, the *Tarr* court quoted favorably from another case wherein the Eighth Court of Appeals held that the restrictive phrase "single-family dwelling" was solely a structural restriction, in large part because the paragraph in which that term appeared "deals with the character of structures that may be 'erected, altered placed or permitted to remain on any residential plot.'" *See id.* (quoting *Permian Basin Ctrs. For Mental Health & Mental Retardation v. Alsobrook*, 723 S.W.2d 774 (Tex. App.—El Paso 1986, writ ref'd n.r.e.)).

Conversely, this Court applied a different approach when interpreting a city zoning ordinance which provided that a "building or premise" in the area "shall be used only for the following purposes: . . . One Family Dwelling." *See Collins v. City of El Campo*, 684 S.W.2d 756, 759 (Tex. App.—Corpus Christi 1984, writ ref'd n.r.e.). We reasoned that this restriction might reasonably mean either (A) that the lot may be used for the construction of only certain structures (i.e., the "premise" may be used only for the construction of a single-family dwelling) or (B) that those structures may be utilized only in certain ways (i.e., the "building" may be used only as the dwelling of one family). *See id.*; *see also Bd. of Adjustment for City of San Antonio v. Kennedy*, 410 S.W.3d 31, 37 (Tex. App.—San Antonio 2013, pet. denied) (construing the term "single-family dwelling

unit" as potentially referring to the types of uses that may be made of a structure, as that term was used in a zoning ordinance). We noted that the operative paragraph was titled "Use regulations," and it therefore reinforced the notion that the term "One Family Dwelling" might have been intended as a use restriction. *See Collins*, 684 S.W.2d at 759.

Here, the wording of the Dwelling Restriction suggests that it refers only to the types of structures that may be constructed on any given lot in the subdivision. Unlike *Collins* and its reference to the use of a "building" for "One Family Dwelling," the Dwelling Restriction here refers to "one single family dwelling *unit per 'Lot'* . . . ." The terms "unit" and "per 'Lot'" clearly orient this restriction to the types of structures that may be erected on a given lot: that the Declaration prohibits the construction of multiple separate dwellings and multi-unit structures that accommodate many families in discrete spaces. *See Stephenson v. Perlitz*, 532 S.W.2d 954, 956 (Tex. 1976) ("The ordinary and commonly accepted meaning of the phrase 'only one residence' per lot is that there shall be no more than one single-family dwelling place on each lot."). We therefore hold that the Dwelling Restriction was solely a structural restriction. *See Tarr*, 2018 WL 2372594, at *9.

It is undisputed that a single-family dwelling structure was erected on Raub's lot. We therefore find no conflict between Raub's use and the Dwelling Restriction.

## 2. The Occupancy Restriction

We next construe the Occupancy Restriction, which limits occupancy of the Property to two possible compositions: (A) one family related by blood, adoption, or marriage "living" with not more than one unrelated person "as a single household unit," or

11

(B) no more than two unrelated persons "living together as a single household unit." We conclude that this restriction is a use restriction rather than a structural restriction. *See, e.g., Permian Basin*, 723 S.W.2d at 775 (using the similar phrase "live as a household unit" to refer to living arrangements rather than structures); *Shaver v. Hunter*, 626 S.W.2d 574, 576 (Tex. App.—Amarillo 1981, writ ref'd n.r.e.) (referring to "living arrangements where the group functions as a single household unit").

*Tarr* offers guidance on the proper interpretation of the Occupancy Restriction. In *Tarr*, the court's task was to construe a restriction which limited use of the property to "residential purposes" and prohibited conduct of noxious or harmful "business" on the tract. *Tarr*, 2018 WL 2372594, at *2. The Fourth Court of Appeals had held that the phrase "residential purposes" connoted both a "physical presence and an intention to remain," and therefore, this restriction prevented Tarr from leasing the home for short periods of time to individuals who did not possess an intent to remain in the house. *Id.* at *3.

The Texas Supreme Court reversed. "[W]e disapprove of the cases that impose an intent or physical-presence requirement when the covenant's language includes no such specification and remains otherwise silent as to durational requirements." *Id.* at *13. The court held that restrictive covenant's vague reference to "residential purposes" did not provide the owners with notice that short-term rentals would be prohibited: these restrictions "fail to address leasing, use as a vacation home, short-term rentals, minimum-occupancy durations, or the like." *Id.*

12

For our discussion of the phrase "living as a household unit," it is critical to note that the *Tarr* court consistently drew parallels between the term "residential purposes" and the term "living." *See id.* "The terms 'residence purposes' and 'residences' require the use of property for *living* purposes as distinguished from uses for business or commercial purposes." *Id.* (quoting *MacDonald v. Painter*, 441 S.W.2d 179, 182 (Tex. 1969)) (emphasis added). "Although 'residential' unambiguously refers to use for *living* purposes, courts have recognized ambiguity in the term in cases involving short-term rentals or other situations where those residing in the property are *living there only temporarily*, not permanently." *Id.* at *12 (quoting *Houston v. Wilson Mesa Ranch Homeowners Ass'n, Inc.*, 360 P.3d 255, 258 (Colo. App. 2015)) (emphasis added).

Most importantly, the court went on to state that in general, the term "residential purposes" does not specifically forbid short-term rentals because "property is used for 'residential purposes' when those occupying it do so for ordinary *living purposes*. So long as the renters continue to relax, eat, sleep, bathe, and engage in other incidental activities, they are using the cabin for residential purposes." *Id.* at *14 n.14 (emphasis added) (editorial marks omitted).

To us, this parallel resolves the matter. Generally speaking, "residential purposes" are equivalent to living purposes, and because the term "residential purposes" does not prohibit short-term rentals, neither does the term "living as a household unit." *See id.* at *13. Like the restrictions discussed in *Tarr*, the Declaration fails to specifically address "leasing, use as a vacation home, short-term rentals, minimum-occupancy durations, or the like." *See id.* Like the restrictions discussed in *Tarr*, the Occupancy

13

Restriction does not specify whether those residing in the Property must live there permanently or may live there only temporarily. *See id.* at *12. Accordingly, like the supreme court in *Tarr*, "[w]e decline to add restrictions" that the Occupancy Restriction does not state in clear wording. *See id.* at *13. The Occupancy Restriction does not prohibit short-term rentals, so long as the renters meet the Declaration's definition of "family." *See id.*

With that interpretation in view, we proceed to determine whether the Schacks' appellate issues demonstrate reversible error.

## C. Judgment as a Matter of Law

By their first issue, the Schacks assert that the trial court erred in refusing to rule, as a matter of law, that Raub's use of the Property violated the Dwelling Restriction and the Occupancy Restriction. The Schacks do not explain where, if at all, they requested such a ruling as a matter of law, and we are under no obligation to exhaust the record in search of such a request. *See Barnett v. Coppell N. Tex. Court, Ltd.*, 123 S.W.3d 804, 817 (Tex. App.—Dallas 2003, pet. denied).

However, our review of the record reveals that the Schacks requested a similar ruling in their motion for partial summary judgment prior to trial: the Schacks asked the trial court to hold that the Declaration unambiguously prohibited short-term rentals. The trial court denied the Schacks' motion and instead issued an interpretation of the Declaration that favored Raub. The case then proceeded to trial.

The general rule is that a denial of a summary judgment is not reviewable on appeal. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625 (Tex. 1996). The exception to this rule occurs where both parties have moved for a final summary judgment

14

and "the appeal is prosecuted from a judgment granting one or more of them." *Ackermann v. Vordenbaum*, 403 S.W.2d 362, 365 (Tex. 1966); *see Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex. 1988) (per curiam). In such situations, the appellate court may reverse the final "summary judgment for one set of parties and render judgment for the others . . . ." *Bowman v. Lumberton Indep. Sch. Dist.*, 801 S.W.2d 883, 889 (Tex. 1990) (op. on reh'g); *Koepke v. Martinez*, 84 S.W.3d 393, 395 n.2 (Tex. App.—Corpus Christi 2002, pet. denied).

That exception does not apply here because the denial of the Schacks' motion for partial summary judgment was followed by a trial on the merits, not an appeal from a final summary judgment. When a trial court's denial of a motion for summary judgment is followed by a trial on the merits, an appellate court cannot review the trial court's denial of summary judgment. *2001 Trinity Fund, LLC v. Carrizo Oil & Gas, Inc.*, 393 S.W.3d 442, 456 n.6 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (op. on reh'g); *see also In re LLO*, No. 13-16-00644-CV, 2017 WL 3530935, at *2 (Tex. App.—Corpus Christi Aug. 17, 2017, no pet.) (mem. op.).[2]

Because we may not review the denial of the Schacks' motion for partial summary judgment, we may not grant judgment as a matter of law in the Schacks' favor. We overrule the Schacks' first issue.

---

[2] "It makes no sense whatever to reverse a judgment on the verdict where the trial evidence was sufficient merely because at summary judgment it was not." *Hernandez v. Ebrom*, 289 S.W.3d 316, 326 (Tex. 2009) (Jefferson, C.J., dissenting) (quoting *Black v. JI Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)) (internal quotations omitted). "The saving of time and expense is the purpose to be attained by a summary judgment in a proper case." *Id.* "When in due course the final trial is had on the merits it becomes the best test of the rights of the movant." *Id.* "If he wins on trial he has his judgment." *Id.* "If he loses on a fair trial it shows that he ought not to have any judgment." *Id.*; *see Ackermann v. Vordenbaum*, 403 S.W.2d 362, 365 (Tex. 1966) ("Generally, the facts are more fully developed upon a conventional trial than they are by the affidavits and depositions relied upon to support or defeat a motion for summary judgment.").

**D.      Submission of a Jury Question**

By their second issue, the Schacks contend that the trial court erred in refusing to submit jury questions concerning whether Raub violated the Dwelling Restriction and the Occupancy Restriction.

If the charge is legally correct, the trial court has broad discretion regarding how to submit the issues, including the wording of questions, definitions, and instructions. *Cont'l Cas. Co. v. Baker*, 355 S.W.3d 375, 382 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (op. on reh'g); *see also Bus. Prod. Supply v. Marlin Leasing Corp.*, No. 13-11-00371-CV, 2013 WL 7141350, at *6 (Tex. App.—Corpus Christi Aug. 29, 2013, pet. denied) (mem. op.). We therefore review a trial court's decision to submit or refuse a particular question, instruction, or definition for an abuse of discretion. *State v. Luby's Fuddruckers Restaurants, LLC*, 531 S.W.3d 810, 819 (Tex. App.—Corpus Christi 2017, no pet.) (mem. op.); *see Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). The trial court abuses its discretion when it acts without regard for any rules or guiding principles. *Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 142 (Tex. 2016).

A party is entitled to jury questions, instructions, or definitions raised by the pleadings and evidence. TEX. R. CIV. P. 278; *Union Pac. R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002). "If an issue is properly pleaded and is supported by some evidence, a litigant is entitled to have controlling questions submitted to the jury." *Triplex Comm. v. Riley*, 900 S.W.2d 716, 718 (Tex. 1995); *Formosa Plastics Corp., USA v. Kajima Intern., Inc.*, 216 S.W.3d 436, 456 (Tex. App.—Corpus Christi 2006, pet. denied) (en banc). This rule provides a substantive, non-discretionary directive to trial courts requiring them to submit controlling questions to the jury if the pleadings and any evidence

16

support them. *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992); *Schwenke v. State*, 960 S.W.2d 227, 234 (Tex. App.—Corpus Christi 1997, pet. denied).

We have held that the Dwelling Restriction relates only to the types of structures that could be erected on Raub's lot. No evidence showed that Raub's use violated this restriction. Accordingly, the trial court correctly determined that the Dwelling Restriction was not required to be submitted for the jury's resolution. *See Triplex*, 900 S.W.2d at 718. Similarly, as we have construed it, the Occupancy Restriction plainly does not prohibit short-term rentals in general.

Beyond short-term rentals, though, the Occupancy Restriction also placed a limitation on the composition of groups who could stay at the Property: one family related by blood or marriage along with one unrelated person, or no more than two unrelated people. The trial court found that the Schacks had not adduced any evidence that Raub rented the property to any group that violated the definition of "family." We agree with this assessment.

The Schacks direct our attention to only two items of evidence related to Raub's guests or the composition of their groups, both of which are emails drafted by Raub. In one email that Raub sent to John Schack, he wrote that "90% of my rentals are extended families such as you, your parents and your children." The Schacks contend that this necessarily implies that the other 10% of Raub's rentals violated the Declaration's definition of family. In a second email, Raub wrote, "By in large, we have extended families get together for family reunions and family time. Usually, grandparents, their adult children and the grandchildren." The Schacks contend that if Raub's guests truly

17

met the Declaration's definition of family, Raub would have said that all of his guests were extended families.

We cannot agree that Raub's emails necessarily imply, by inversion, that some of his rentals violated the Declaration.[3]  Even if Raub had unconditionally stated that 10% of his guests were not extended families, the Declaration does not provide that only extended families may satisfy the Occupancy Restriction.  Instead, the Declaration's definition of "family" would be satisfied by a group composed of one family related by blood or marriage along with one unrelated person, or no more than two unrelated people. The Schacks introduced no evidence that Raub's guests did not qualify under one of these compositions.  Because no more than a scintilla evidence supported the issue of whether Raub violated the Dwelling Restriction, we conclude the trial court did not err in denying its submission.  *See Triplex Comm.*, 900 S.W.2d at 718.

We overrule the Schacks' second issue.

### III.    THE COMMERCIAL ENTERPRISE RESTRICTION

By their fourth through eighth issues, the Schacks challenge various matters related to the Commercial Enterprise Restriction.  Again, our first task is construing the Commercial Enterprise Restriction.  This question of construction relies on the same standard of review and applicable law previously described.  *See supra*.

## A.    Construction of the Commercial Enterprise Restriction

---

[3] *Cf. United States Fid. & Guar. Co. v. Goudeau*, 272 S.W.3d 603, 606 (Tex. 2008) (applying the principle of logic that rejection of one proposition does not necessarily imply that the opposite proposition is true).

The Commercial Enterprise Restriction provides, "No commercial enterprise of any sort shall be situated on any tract . . . ."   In assessing such a restriction, we must inquire whether the covenant's language focuses upon the owner's use of the property or upon the activity that actually takes place on the land.   *Tarr*, 2018 WL 2372594, at *12. Distinguishing between restrictions concerning off-site uses and on-site uses is helpful when assessing a covenant's tolerance for short-term rentals, because in internet rental arrangements such as Raub's VRBO page, much of the arguably "commercial" activity often occurs off the property:

> The actual renting of the cabin, and any financial transactions associated therewith, occurs off-site.   The owners do not solicit renters on-site, but do so through the Internet, where potential tenants can view the premises without actually going there.   While occupying the cabin, the tenants must cook and clean for themselves and they do not receive any services from the owners.   Although the owners remit a lodging tax, that fact does not detract from the conclusion that no commercial activity takes place on the premises.

*Tarr*, 2018 WL 2372594, at *14 n.14 (quoting *Slaby v. Mountain River Estates Residential Ass'n, Inc.*, 100 So. 3d 569, 580 (Ala. Civ. App. 2012)) (editorial marks omitted).

Here, the Commercial Enterprise Restriction relates solely to the activity "on any tract," and the focus is therefore what commercial activity actually transpires on the Property.   When dealing with similar restrictions, "[o]ther state courts have measured the commercial or business purposes . . . by examining whether the use involved employees or other indicia of business on the tract itself."   *Id.* at *14 n.15; *see also id.* at *1 (emphasizing that guests at the property were "unaccompanied by employees and without services a hotel stay might provide, such as cooked meals or housekeeping" and the owner did not maintain offices or place signs on the property).   Thus, determining

19

whether the Commercial Enterprise Restriction was violated depends on the degree to which Raub's rental operation had a commercial presence on the Property itself.

**B.      Judgment as a Matter of Law**

By their fourth issue, the Schacks assert that the trial court erred in refusing to rule, as a matter of law, that Raub's use of the Property violated the Commercial Enterprise Restriction.   Again, the Schacks do not explain where, if at all, they requested such a ruling other than their motion for partial summary judgment prior to trial.   Because the trial court's denial of the motion for summary judgment was followed by a trial on the merits, we cannot review the trial court's denial of summary judgment.   *See 2001 Trinity Fund*, 393 S.W.3d at 456 n.6.

We overrule the Schacks' fourth issue.

**C.      Factual Sufficiency**

By their fifth issue, the Schacks bring a factual sufficiency challenge against the jury's finding that Raub did not violate the Commercial Enterprise Restriction.   The Schacks assert that it was against the great weight of the evidence for the jury to determine that Raub's short-term rental operation did not constitute a prohibited "commercial enterprise."

In reviewing factual sufficiency, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered.   *Crosstex N. Tex. Pipeline, LP v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016).

20

The Schacks presented little or no evidence of commercial activity and "indicia of business" on the Property. *See Tarr*, 2018 WL 2372594, at *14 n.15. Instead, the only evidence concerning on-site activity concerned Raub's guests and their use of the Property for sleeping and eating during family reunions, retreats, and the like. There was no evidence that Raub provided guests with any services during the rental period or that he equipped the Property with offices, kiosks, signs, or any other articles indicative of a formal "commercial enterprise."

Conversely, while there was evidence that Raub conducted some arguably "commercial" activities such as advertising and remitting hotel occupancy taxes, there was no evidence that these "commercial" activities occurred on the Property itself. Raub paid hotel occupancy taxes and formed an LLC, but there was no evidence that he did so on the Property. Instead, the evidence was that Raub lived and worked elsewhere in the area, and he spent no more than 10% of his time living at the Property. Nor does the fact that Raub drew income from his property establish a commercial enterprise.[4]

After reviewing all the evidence, we cannot say that the jury's resolution of this question was so contrary to the overwhelming weight of the evidence that the answer should be set aside and a new trial ordered. *See Crosstex N. Tex.*, 505 S.W.3d at 615.

We overrule the Schacks' fifth issue.

**D. Submission of Jury Questions and Admission of Evidence**

---

[4] *See Lowden v. Bosley*, 395 Md. 58, 69 (2006) ("In addition to conventional rentals, a commercial benefit may be realized from residential property by persons or entities holding ground rents, mortgages, or deeds of trust. When property is used for a residence, there simply is no tension between such use and a commercial benefit accruing to someone else.").

By their sixth issue, the Schacks complain that the trial court erred in refusing their proposed jury question concerning the Commercial Enterprise Restriction. The Schacks do not include any specific argument related to this issue, and we find it inadequately briefed. *See* TEX. R. APP. P. 38.1(i). We overrule the Schacks' sixth issue.

By their seventh issue, the Schacks complain that the trial court erred by submitting Raub's charge concerning the Commercial Enterprise Restriction. The trial court charged the jury as follows:

> Does Raub's short-term leasing constitute a "commercial enterprise" under the Declaration?
>
> It is your duty to interpret the following language of the agreement:
>
>> A. 1, on pg. 2-3 of the Declaration:
>>
>>> "No commercial enterprise of any sort shall be situated on any tract included therein . . . ."
>
> You must decide its meaning by determining the intent of the author of the Declaration at the time the Declaration was drafted. Consider all the facts and circumstances surrounding the drafting of the Declaration, the interpretation placed on the agreement by the Developer, and the conduct of the Developer.
>
> Answer "Yes" or "No."

The Schacks contend that this charge inappropriately commented on the weight of the evidence—particularly its instruction to consider "the interpretation placed on the agreement by the Developer, and the conduct of the Developer." The Schacks argue that this instruction improperly emphasized evidence favorable to Raub: testimony by the developer, Richard Gaul.

By their eighth issue, the Schacks argue that the trial court should not have admitted Gaul's testimony in the first instance. We take these issues up together.

22

### 1. Applicable Law

Again, a trial court is given wide latitude to determine the propriety and wording of explanatory instructions and definitions. *See H.E. Butt Grocery Co. v. Bilotto*, 985 S.W.2d 22, 23 (Tex. 1998). An appellate court will not reverse a judgment for a charge error unless that error was harmful because it probably caused the rendition of an improper judgment or probably prevented the petitioner from properly presenting the case to the appellate courts. *Thota*, 366 S.W.3d at 687. "Charge error is generally considered harmful if it relates to a contested, critical issue." *Id.*

The court shall not in its charge comment directly on the weight of the evidence but the courts charge shall not be objectionable on the ground that it incidentally constitutes a comment on the weight of the evidence when it is properly a part of an instruction or definition. TEX. R. CIV. P. 277. A comment on the weight of the evidence may take many forms, but we specifically prohibit judicial comments that indicate the opinion of the trial judge as to the verity or accuracy of the facts in inquiry. *In re M.S.*, 115 S.W.3d 534, 538 (Tex. 2003). A submission to the jury is objectionable if it assumes a disputed fact in issue. *UMLIC VP LLC v. T&M Sales & Envtl. Sys., Inc.*, 176 S.W.3d 595, 608 (Tex. App.—Corpus Christi 2005, pet. denied).

We review a trial court's evidentiary rulings for abuse of discretion. *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 727 (Tex. 2016).

### 2. Discussion

The Schacks complain of the instruction to "[c]onsider all the facts and circumstances surrounding the drafting of the Declaration, the interpretation placed on the agreement by the Developer, and the conduct of the Developer." The Schacks

23

protest that this instruction unfairly highlights evidence that was favorable to Raub: Gaul's testimony that when he developed the subdivision, he did not intend for the Declaration to restrict short-term rentals, and his "conduct" in allowing short-term rentals in his other subdivision developments.

"When a jury instruction encourages the jury to give undue weight to certain evidence . . . the instruction constitutes an impermissible comment on the weight of the evidence." *GTE Mobilnet of S. Tex. LP v. Telecell Cellular, Inc.*, 955 S.W.2d 286, 292 (Tex. App.—Houston [1st Dist.] 1997, writ denied) (op. on denial of reh'g). We agree with the Schacks that the trial court's instruction had some tendency to emphasize certain evidence favorable to Raub above other forms of evidence.[5] The Schacks assert that the errors in the charge and in the admission of Gaul's testimony led the jury to erroneously return a verdict in favor of Raub on the Commercial Enterprise Restriction.

However, even assuming that the trial court abused its discretion—which we do not decide—we cannot say that any error probably caused the rendition of an improper judgment or prevented the Schacks from presenting the case to this Court. *See Thota*, 366 S.W.3d at 687. The jury heard virtually no evidence of the sorts of on-site "indicia of business" that would violate the Commercial Enterprise Restriction and justify a verdict in the Schacks' favor under this restriction. *See Tarr*, 2018 WL 2372594, at *14 n.15. Indeed, there was little evidence of on-site activity at all, and that scant evidence mostly

---

[5] The emphasis on "the interpretation placed on the agreement by the Developer" is arguably more concerning, because when we construe a contract to determine the intent of the parties, it is the objective intent that controls and not their present interpretations or subjective intent. *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968); *Neel v. Tenet HealthSystem Hosps. Dallas, Inc.*, 378 S.W.3d 597, 605 (Tex. App.—Dallas 2012, pet. denied); *see also Tarr*, 2018 WL 2372594, at *4.

24

described Raub's guests and their use of the Property for the non-commercial purposes of sleeping, eating, and relaxation.

Because there was nothing to support a verdict in favor of the Schacks on this jury question, we cannot say that any error in the charge or the admission of evidence caused the rendition of an improper judgment in favor of Raub. *See* TEX. R. APP. P. 44.1(a); *Garcia v. Spohn Health Sys. Corp.*, 19 S.W.3d 507, 513 (Tex. App.—Corpus Christi 2000, pet. denied) (finding error harmless because appellant-plaintiff presented no evidence that would otherwise support a judgment to the contrary). Any error is therefore harmless.

We overrule the Schacks' seventh and eighth issue.

## IV. EXCLUSION OF EVIDENCE

By their third issue, the Schacks assert that the trial court erred in excluding certain evidence that Raub and his rental operation violated the Dwelling Restriction.

### A. Standard of Review

We review a trial court's evidentiary rulings for abuse of discretion. *Sw. Energy*, 491 S.W.3d at 727. The proponent of hearsay has the burden of showing that the testimony fits within an exception to the general rule prohibiting the admission of hearsay evidence. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 908 n.5 (Tex. 2004).

### B. Internet Site Evidence

The Schacks first complain that the trial court erred in excluding content from Raub's VRBO page: a section of reviews and comments by Raub's guests. According to the Schacks, the customer comments show that many of Raub's guests did not meet the definition of family. For instance, one user described a couples' retreat, at which a

25

group of nine different couples stayed at the Property.   Another user described a stay by a group of eighteen individuals from "five families."

The Schacks argue that the customer comments were not hearsay because they were not offered for the truth of the matter asserted.   *See* TEX. R. EVID. 801(d).   We disagree.   The Schacks offered the customer comments solely for the probative value of the matter explicitly asserted:   that Raub hosted groups such as nine couples or eighteen people from five families.   *See id.*

The Schacks next contend that the customer comments are not hearsay because they qualified as party admissions.   Certain out-of-court statements offered for their truth are not hearsay.   *Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 855 (Tex. 2011).   Among those are admissions by a party-opponent, which include a statement of which the party has manifested an adoption or belief in its truth. *Id.* at 855–56 (quoting TEX. R. EVID. 801(e)(2)).   "It has long been the rule that where a party has used a document made by a third party in such way as amounts to an approval of its contents, such statement may be received against him as an admission by adoption."   *Id.* at 856 (editorial marks and internal quotations omitted).

The Schacks argue that the customer comments fall within the party-admission rule.   According to the Schacks, Raub invited customers to leave comments on the VRBO page, and he thereby "authorized his customers to make public statements about their stays" at the Property.   The Schacks assert that because Raub permitted the comments to remain on his page, he thereby adopted the customer comments as his own statements and manifested his belief in the truth of these comments.

26

As support, the Schacks cite a Washington state defamation case. *Momah v. Bharti*, 144 Wash. App. 731, 749 (2008), as amended (July 3, 2008). There, an attorney filed suit alleging that a physician raped a patient, who was the attorney's client. *Id.* at 737. The attorney, Bharti, made public accusations against the physician, Momah, and those remarks were published in the local media. *Id.* Bharti then posted links to his remarks on his own website, which also contained favorable reviews from his clients. *Id.* An investigation cleared Momah of wrongdoing, and he sued Bharti for defamation. *Id.* At the summary judgment stage, Bharti objected to the introduction of the links, comments, and other content from his own website, arguing that they were hearsay. *Id.* at 749. The trial court excluded the links. *Id.* at 748–49.

The court of appeals in *Momah* reversed and held that the links on Bharti's website should have been admitted:

> By posting on his website, Bharti has taken affirmative steps to provide the information to inform the public about himself and his legal practice. He would not use this information to represent himself if he did not expect the public to believe its truthfulness. Bharti does not dispute that the website belongs to him or contend that he does not control the content of the website. By providing the content as a means of publicizing himself, Bharti effectively manifests his belief in the truth of the information. . . . They are not hearsay . . . .

*Id.* at 750.

The Schacks argue that we should apply the same principle and require admission of the customer reviews. However, we find *Momah* distinguishable on at least four accounts.

First, in *Momah*, the defendant himself was the declarant for the majority of the out-of-court statements. Here, the declarants were multiple anonymous VRBO users

27

who never appeared at trial. Second, the defendant in *Momah* actively published the content to his own website, and he thereby took "affirmative steps" which signified his belief in the truth of the statements. *Id.* By contrast, Raub passively allowed customers to post their own remarks to VRBO's website.[6] In our view, Raub's passive role in the matter does not manifest adoption or belief in the truth of the comments.[7] "[N]ot every statement that appears on an opponent's website is attributable to the opponent." Steven Goode, *The Admissibility of Electronic Evidence*, 29 Rev. Litig. 1, 47 (2009). "Many website owners allow third parties to post comments, but do not adopt those third-party comments as their own." *Id.*

"Context will often be important in determining whether, by linking to the external site, the website owner intends to adopt the truth of what appears on the linked page." *Id.*[8] This point leads to the third distinction: in *Momah*, the context indicated the

---

[6] It has been said that "[i]f one has remained silent, where if the situation had been as he alleges, it would have been natural and usual for him to speak, this circumstance may be proved against him as an admission." *Tex. Gen. Indem. Co. v. Scott*, 152 Tex. 1, 7 (1952); *see Wenk v. City Nat. Bank*, 613 S.W.2d 345, 349 (Tex. Civ. App.—Tyler 1981, no writ). However, it would not have been "natural and usual" for Raub to speak in response to his customers' description of their groups; we would not expect him to chastise his guests given his obligations as a host, or to contradict them given his limited knowledge of any given group's composition. *See Tex. Gen. Indem.*, 152 Tex. at 7. Indeed, the evidence suggested that Raub's only knowledge concerning the composition of any group stemmed from his guests' representation in the rental agreement that they met the Declaration's definition of a "family." A court should be "reluctant to credit mere silence—inherently ambiguous—as 'conduct' sufficient for adoption of an inculpatory statement." *New England Mut. Life Ins. Co. v. Anderson*, 888 F.2d 646, 650 (10th Cir. 1989). Therefore, we do not regard Raub's silence as a tacit endorsement of the truth of the customer reviews. *See id.*

[7] *Cf. Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 857 (Tex. 2011) (finding adoption where a party opponent called the declarant as a witness and sponsored testimony duplicating the out-of-court statements); *Wagstaff v. Protective Apparel Corp. of America, Inc.*, 760 F.2d 1074, 1078 (10th Cir. 1985) ("By reprinting the newspaper articles and distributing them to person with whom defendants were doing business, defendants unequivocally manifested their adoption of the inflated statements made in the newspaper articles.").

[8] *See* Molly D. McPartland, *An Analysis of Facebook "Likes" and Other Nonverbal Internet Communication Under the Federal Rules of Evidence*, 99 Iowa L. Rev. 445, 459 (2013) ("[T]he simple act of forwarding an e-mail message does not necessarily constitute an adoptive admission without *context* indicating an adoption of the information contained within." (Emphasis added)).

attorney's adoption of the out-of-court statements, because the attorney held out favorable customer reviews to the public for the purpose of promoting the strengths of his practice. *See Momah*, 144 Wash. App. at 750. Here, the context does not indicate adoption, because Raub apparently had no power to remove unfavorable or untrue reviews. *See Galland v. Johnston*, No. 14-CV-4411 RJS, 2015 WL 1290775, at *2 (S.D.N.Y. Mar. 19, 2015) (documenting a residence-owner's request to a VRBO user that she remove a negative review). The fact that the reviews appeared on Raub's VRBO page cannot be taken as an indication of Raub's belief in their truth.

Even if we saw the merits of the issue somewhat differently, a fourth point of distinction—the standard of review—might dissuade us from acting. The *Momah* court was bound under Washington law to apply a de novo standard of review to the evidentiary rulings. *Momah*, 144 Wash. App. at 749. By contrast, under Texas law, we review evidentiary rulings for an abuse of discretion, *Sw. Energy*, 491 S.W.3d at 727, which is a "deferential" standard. *In re J.B. Hunt Transp., Inc.*, 492 S.W.3d 287, 293 (Tex. 2016) (orig. proceeding). We are therefore less empowered and far less inclined to overrule the trial court's decision, as compared to the *Momah* court.

We therefore find *Momah* inapposite, and we conclude that Raub did not manifest an adoption of the customer comments. Accordingly, the trial court did not abuse its discretion in excluding the customer reviews.

## C. Photographic Evidence

The Schacks next contend that the trial court erred in excluding a series of several pictures of the Property. As a group, the images depict the Property as a three-story house situated in an open field of grass next to the water, with several cars parked on the

29

road leading up to the Property. The Schacks argue that the number of cars on any particular date, and the different vehicles on different dates, are circumstantial evidence that persons associated with the vehicles were visiting, not "living," at the Property.

The Schacks' argument lacks merit. *Tarr* recognizes that renters may live at a property "only temporarily," *see Tarr*, 2018 WL 2372594, at *12, so long as the renters "relax, eat, sleep, bathe, and engage in" other activities incidental to residing in the Property. *See id.* at *14 n.14. Beyond the issue of "living" at the Property, the volume and variety of cars have little relevance to whether Raub's renters met the Declaration's definition of "family." *See* TEX. R. EVID. 401. The trial court did not abuse its discretion in excluding the images.[9]

We overrule the Schacks' third issue.

## V. ATTORNEY'S FEES

By their ninth issue, the Schacks argue that the trial court erred in awarding attorney's fees to Raub and the POA. By their tenth issue, the Schacks argue that the trial court should have instead awarded attorney's fees solely in their favor.

Following the jury's verdict, the trial court concluded that Raub was the prevailing party against the Schacks and he was entitled to attorney's fees under the declaratory judgment act. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West, Westlaw through 2017 1st C.S.). The trial court awarded him attorney's fees in an amount determined

---

[9] The Schacks complain that the trial court erred in excluding reports showing that Raub paid hotel occupancy taxes on $153,000 in revenue in two years' time, or roughly $1,400 per week on average. These exhibits had limited relevance to the "commercial enterprise" question, and we find no abuse of discretion in their exclusion. *See Lowden*, 395 Md. at 69.

30

reasonable and necessary by the jury: $178,001.34 for proceedings in the trial court and $107,500.00 for various stages of appeal.

As to the Schacks' suit against the POA, the trial court found that each party had prevailed in part—the Schacks obtained a verdict that the POA's Interpretation was arbitrary and capricious, but the POA secured a finding that it did not "fail to comply with its obligations under the Declaration to enforce the Declaration or Interpretation against Raub." However, the trial court denied the Schack's request for attorney's fees and instead elected to award attorney's fees solely to the POA in the amount determined reasonable and necessary by the jury: $215,000.00 for proceedings in the trial court and $107,500.00 for various stages of appeal.

The Schacks first argue that it was inequitable and unjust to award attorney's fees to the POA. The Schacks contend that the equities of the case instead required an award of attorney's fees in their favor.

The Uniform Declaratory Judgment Act (DJA) permits a trial court to "award costs and reasonable and necessary attorney's fees as are equitable and just." *Id.*; *Kinsel v. Lindsey*, 526 S.W.3d 411, 427 (Tex. 2017). A judge's decision to award or not award attorney's fees is reviewed on appeal for an abuse of discretion. *Ridge Oil Co., Inc. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 163 (Tex. 2004). The DJA "entrusts attorney fee awards to the trial court's sound discretion, subject to the requirements that any fees awarded be reasonable and necessary, which are matters of fact, and to the additional requirements that fees be equitable and just, which are matters of law." *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). Put differently, we review the trial court's

31

decision not to award fees under the DJA for an abuse of discretion; by contrast, we review the trial court's award of fees for an abuse of discretion, for the factual requirement that the award be reasonable and necessary, and for the legal requirement that the award is equitable and just. *See id.* Whether it is equitable and just to award attorney's fees is not susceptible to direct proof but is rather a matter of fairness in light of all the circumstances. *See Ridge Oil*, 148 S.W.3d at 162; *see also Coover v. Enerfin Field Servs., LLC*, No. 13-10-00600-CV, 2012 WL 1964542, at *10 (Tex. App.—Corpus Christi May 31, 2012, no pet.) (mem. op.).

The Schacks argue that this award is inequitable because the POA persistently violated the Texas Open Meetings Act (TOMA). However, the Schacks did not offer a jury question concerning the purported TOMA violations, and no question concerning TOMA violations was included in the charge. We decline the Schacks' invitation to use unsubstantiated TOMA allegations as a basis to reverse the trial court.

Next, the Schacks emphasize the jury's verdict that the POA's Interpretation was arbitrary and capricious, and they argue that this finding (1) prevents an award of attorney's fees in favor of the POA and (2) instead requires an award of fees to the Schacks.

In arguing against the POA's award, the Schacks essentially contend that mixed jury findings render it inequitable to award attorney's fees to either party. We find the opposite to be true. *See Sierra Crest Homeowners Ass'n, Inc. v. Villalobos*, 527 S.W.3d 235, 249 (Tex. App.—El Paso 2016, no pet.) (affirming a mutual award of attorney's fees

to both the HOA and the protesting homeowners as equitable where "trial was hotly contested" and "the jury made findings in favor of both parties").

Moreover, it is well established that a party need not prevail to be awarded attorney's fees under the DJA. *Barshop v. Medina Cty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 637 (Tex. 1996). Instead, a trial court may, in equity, decline to award attorney's fees to either party or award attorney's fees to a non-prevailing party. *See Brookshire Katy Drainage Dist. v. Lily Gardens, LLC*, 333 S.W.3d 301, 313 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (op. on reh'g); *see also Arcturus Corp. v. Espada Operating, LLC*, No. 13-13-00713-CV, 2016 WL 4272381, at *12 (Tex. App.—Corpus Christi Aug. 11, 2016, no pet.) (mem. op.). If the non-prevailing party may be awarded attorney's fees without offending equity, we do not believe that it is patently inequitable to award attorney's fees to one partially successful party but not the other. *See Brookshire Katy*, 333 S.W.3d at 313. We therefore cannot say that the trial court misjudged the equities as a matter of law when it awarded attorney's fees to the POA. *See Bocquet*, 972 S.W.2d at 21.

With the mixed jury findings in mind, the trial court denied attorney's fees to the Schacks, and we review that decision purely for an abuse of discretion. *See Ridge Oil*, 148 S.W.3d at 163. We cannot say the trial court acted arbitrarily and without reference to guiding rules when it declined the Schacks' prayer for attorney's fees. *Caffe Ribs*, 487 S.W.3d at 142.[10]

---

[10] *See also Corcoran v. Atascocita Cmty. Imp. Ass'n, Inc.*, No. 14-12-00982-CV, 2013 WL 5888127, at *12 (Tex. App.—Houston [14th Dist.] Oct. 31, 2013, pet. denied) (mem. op.) ("Thus, homeowners considering legal action should weigh the potential merits and equities of their own unique claims against the possibility of being held liable for their opponents' attorney's fees . . . .").

Next, the Schacks argue that the fee award to Raub should be reversed because his declaratory action was duplicative of issues already put in issue by the Schacks' declaratory action. The Schacks cite the rule that simply repleading a claim as one for a declaratory judgment cannot serve as a basis for attorney's fees. *Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 624 (Tex. 2011) (per curiam). When a claim for declaratory relief is merely "tacked onto" statutory or common-law claims that do not permit fees, attorney's fees are disallowed. *Id.* The declaratory judgment claim must do more "than merely duplicate the issues litigated" via contract or tort claims. *Id.*

The rule cited by the Schacks does not apply. The Schacks filed a bona fide declaratory action arguing that Raub's rental operation violated the Declaration, and Raub counterclaimed with a declaratory action of his own. For these claims, the DJA was not a disguise for a claim better recognized and litigated as breach of contract, tort, or some other cause of action. Neither party's declaratory claim is the sort of artfully pleaded imitator that is prohibited by *Etan Industries*. *See id.*

Finally, the Schacks argue that the fee awards to Raub and the POA should be reversed along with the reversal of the judgment on the merits. When an appellate court reverses a declaratory judgment, it may reverse an attorney's fee award, but it is not required to do so. *Kachina Pipeline Co., Inc. v. Lillis*, 471 S.W.3d 445, 455 (Tex. 2015) (op. on denial of reh'g). We have determined that the judgment should not be reversed, and we therefore need not determine whether the fee awards should be reversed on this basis.

We overrule the Schacks' ninth and tenth issues.

## VI. CONCLUSION

We affirm the judgment of the trial court.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the
19th day of July, 2018.