

# NUMBER 13-18-00550-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

CERTIFIED VALUE, INC. D/B/A KIDSTEAM
AND JOHN HAMPTON,                                                Appellants,

v.

INFINITE PLAY CO.,                                                Appellee.

---

### On appeal from the 105th District Court
### of Nueces County, Texas.

---

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Perkes[1]**
**Memorandum Opinion by Justice Longoria**

---

[1] The Honorable Gregory T. Perkes, former Justice of this Court, was a member of the panel at the time this appeal was orally argued but did not participate in this decision because his term of office expired on December 31, 2020.

Appellee Infinite Play Co. (Infinite Play) contracted with appellants Certified Value, Inc. d/b/a Kidsteam (Certified Value) and its sole owner and operator, John Hampton, to construct and install indoor play equipment for appellee's children's play center in Corpus Christi, Texas. Following multiple alleged complications with the installation process and an unsatisfactory completion, appellee filed suit against appellants, claiming fraudulent inducement, breach of contract, breach of express and implied warranties, violations of the Deceptive Trade Practices Act (DTPA), negligent misrepresentation or negligent omissions, and seeking exemplary damages and attorney's fees. Appellants filed a counterclaim and partial no evidence and traditional motions for summary judgment, the latter of which were denied by the trial court. At trial, following the denial of appellants' motion for directed verdict, a jury found in favor of appellee, and appellants' ensuing motion for judgment notwithstanding the verdict (JNOV) was denied.

By five issues, which we have reorganized and renumbered, appellants assert: (1) the trial court erred in denying their no-evidence and traditional summary judgment motions; (2) the trial court erred in denying their motions for directed verdict and JNOV; (3)–(4) the trial court abused its discretion in failing to submit a predicate jury instruction on the requirement of a written agreement in a fraudulent inducement claim and including an instruction on a cause of action not pleaded; and (5) the trial court abused its discretion in permitting appellee's expert witness to testify. We affirm.

## I.    BACKGROUND

On May 10, 2016, appellee filed suit against appellants. Appellee principally alleged appellants failed to provide a play center that met appropriate safety standards as they represented that they would. Appellants filed their original answer on June 20,

2

2016, and an original counterclaim on May 18, 2017, asserting appellee had: (1) breached their contract by bringing a suit asserting claims without basis and which it had waived pursuant to the express terms of the written agreement; (2) unlawfully copied and disseminated appellants' design renderings in violation of copyright laws; and (3) misappropriated trade secrets in its use and disclosure of renderings. Appellants sought damages for unjust enrichment, as well as exemplary damages and attorney's fees.

On February 1, 2018, appellants filed partial no-evidence and traditional motions for summary judgment arguing: (1) appellee's DTPA claim failed because appellee had produced no evidence of its "consumer" status; (2) appellee's fraud and negligent misrepresentation claims failed because there was no evidence of justifiable reliance or a written contract, and appellee's independent investigation negated reliance; and (3) appellee's breach of contract claim failed because there was no evidence of a written contract. The trial court denied appellants' motions, and the case proceeded to trial.

A.    Trial

1.    Tiffany Ybarra

Tiffany Ybarra is the sole owner of Infinite Play, which operated an indoor children's play center in Corpus Christi, Texas from 2015 to 2017. Ybarra testified she created Infinite Play in early 2015 after seeing a need for children-based entertainment in the Corpus Christi area. Ybarra conceded she had no prior experience operating an entertainment or child-centered facility and stated she hired a friend and former co-worker, Celeste Rittgers, to assist her. Ybarra instructed Rittgers to "look for quality, safe playground equipment" for the business. According to Ybarra, Rittgers found Certified

3

Value's website, and based on the website, the two women believed Certified Value to be the manufacturer of safe, indoor play spaces. At trial, Ybarra read aloud various portions of Certified Value's website regarding its' membership affiliations,[2] compliance with ASTM International (ASTM) safety standards,[3] and design, manufacturing, and installation warranties.[4]

Ybarra additionally read several e-mails into the record. In early May 2015, Rittgers and Hampton began exchanging e-mails regarding appellants' services. Ybarra and Rittgers traveled to Dallas, Texas to meet with Hampton and tour Certified Value's facility on May 29, 2015. Ybarra testified that, ultimately, as a result of repeated assurances by Hampton, appellee and appellants entered into an oral agreement for the purchase and complete installation of an indoor play center for $119,762.03. On June 8, 2015, Rittgers confirmed via e-mail that the two companies were "[g]etting closer" to coming to an agreement regarding the finalized design. On June 10, 2015, Ybarra received a pro rata invoice via e-mail from Hampton. While a document titled "Terms and Conditions of Sale" was attached to the invoice, and the document contained multiple blanks throughout indicating a purchaser's signature was required, Ybarra testified she never read or signed

---

[2] Certified Value's website stated it was a member of the International Association for Amusement Parks and Attractions (IAAPA) and ASTM.

[3] "[ASTM] is one of the largest voluntary standards developing organizations in the world," responsible for "develop[ing] technical documents that are the basis of manufacturing, management, procurement, codes and regulations for dozens of industry sectors." *Frequently Asked Questions*, ASTM INT'L, https://www.astm.org/ABOUT/faqs.html (last visited Jan. 29, 2021). Certified Value's website stated, in part, that it "constantly works to enhance [its] indoor playground material and component specifications so that they meet or exceed applicable U.S. ASTM F918 and EN71 European standards."

[4] The website stated Certified Value "designs, manufactures, and installs turnkey solutions that promote [the] health and overall wellbeing of children," and its products were "made in North America." The website also provided the following warranty: "[We are] so confident that our quality meets or exceeds industry standards that we will match any competitor's written warranty and extend that warranty by one year."

4

the terms and conditions nor was she ever asked to do so by Hampton. On June 15, 2015, Ybarra wired $60,000.00 to Certified Value. Hampton sent Ybarra another invoice on June 22, 2015, confirming receipt of the wire transfer; the invoice also contained attached terms and conditions. Ybarra submitted four requests for design modifications after payment; the last request was made on October 9, 2015, the day before the projected start of installation.[5] Installation was completed in November 2015.[6] Ybarra testified she was never billed for any modification requests.

Ybarra said she initially believed she "had the safest playground you could possibly have" for about six months until "things [began] happening." Ybarra testified she began to notice construction defects and problems indicating substandard materials had been used in the construction of the play center. Ybarra said, for example, she observed holes in the netting, exposed metal and fitting bolts, landings breaking, train tracks sliding, and cracks at the bottom of the slide. Ybarra testified that Hampton failed to respond to Ybarra's repeated requests for repairs or assistance. Although Hampton initially made assurances via e-mail that any missing equipment or materials requiring replacement would be addressed, Hampton ceased communicating by March 2016.[7] In an alternative attempt to rectify the play center deficiencies, Ybarra contacted Certified Value's competitor, IPlayCo, but IPlayCo refused to "take on" any play center made by Certified

---

[5] It is unclear from the record when Ybarra approved the final design for the play center. The invoices on June 15 and June 22 stated that a "[f]inal revision to toddler area and design book will replace this design" and an "[e]xtra kidsteam car [was] to be provided in [the] final design."

[6] Although appellee held a grand opening on November 11, 2015, Ybarra disputes that the play center was completed at the time because several components were still missing or had not been installed, such as "[a]ctivity panels and some additional toy blocks and other items on the floor that were toys that go in the toddler area."

[7] In an e-mail dated March 31, 2016, from Ybarra to Hampton, Ybarra complained of incomplete and missing equipment, including a balance beam, aluminum train cars, and roofing for a playscape. No response from Hampton is indicated in the record.

Value. IPlayCo proposed the creation of new play center in the amount of $238,604.00. Ybarra stated that, based on estimations she received, Certified Value's play center was worth $15,000.00 in salvage value before commission or shipping costs.

### 2. Celeste Rittgers

Rittgers testified she previously worked performing "data entry" at a company owned by Ybarra's husband. Rittgers lost her job after the company dissolved. Rittgers testified that around January 2015, Ybarra reached out to her with a "business she was thinking about and wanted to know if [Rittgers] could help her." Rittgers said the two began conducting research, "trying to figure out what we were going to do to start the company[,] the things that we needed." They settled on an indoor play area.

Rittgers testified she could "remember distinctly looking at three different websites" for potential indoor play equipment system manufacturers. Of the three companies Rittgers contacted, only appellants responded. In May 2015, contact between Rittgers and Hampton was "almost daily." By the May trip to Dallas, over twenty e-mails had been exchanged and "at least ten to [fifteen] phone calls." Rittgers testified, "[Hampton] sold his equipment. He sold himself. He was a very good salesman. [H]e gave—gave us no reason to believe that everything he said wasn't true." According to Rittgers, Hampton reinforced the information contained on Certified Value's website, said "[e]verything was manufactured by them," promised to "work with us on as many designs" as needed, and boasted about meeting ASTM standards—although she and Ybarra did not know what ASTM standards were. Rittgers testified she and Ybarra left the meeting "pumped and excited to get a design picked."

6

From May to September 2015,[8] Rittgers was the sole point of contact on behalf of appellee. Rittgers testified that problems with appellants arose prior to construction during the shipment of materials when appellants began transporting equipment by piecemeal, rather than the agreed upon single shipment, creating storage complications for appellee. Rittgers asserted that, contrary to appellants' promises, the installation process was disorganized and did not result in a "turnkey" play center.

### 3.    Melanie Short

Appellee's expert, Melanie Short, testified she was asked to "perform a playground safety audit of the soft contained playground equipment." At the time that Short prepared the audit, she was a certified playground safety inspector, but she has since let her license lapse. Short explained her certification was through the National Parks and Recreation Association which required that she attend a "three-day intensive class session," reviewing "the outdoor playground ASTM standard and all the associated ones," followed by a pass/fail exam to obtain certification. Short testified she remains a member of ASTM's Building Enclosure and Playground Safety sections.

According to Short, when conducting an audit, the auditor will review the entire facility for four levels of concern, ranging from "hazard level one," which indicates an "imminent threat" of "permanent disability basically or death," to level four, which "is basically deferred maintenance." Short testified she found thirty level one and level two violations following her review of the play center built by appellants. Short maintained the violations had nothing to do with maintenance concerns, but rather, reflected installation

---

[8] Rittgers ended her employment with appellee in November 2015 after she became pregnant. Her title changed three times in the period she worked for appellee. Rittgers initially held the title "business manager," which was later changed to "operations coordinator." At the time she left her position, Rittgers was the "social media administrator and events coordinator."

and design defects. For example, Short testified there were multiple areas that lacked safety enclosures, allowing for children to get behind or underneath equipment. Short additionally testified that "anyone representing compliance with [ASTM] F1918," was required to, pursuant to ASTM rules, "keep all the essential records necessary to document any claim that the requirements have been met and that includes those things like fire testing and—and such that require certifications." Short stated that although she did receive some certifications from appellants, she was "unable to match those with some of the materials" used in the play center.

Short summarily opined: "[T]he soft contained playground equipment provided by and installed at [appellee's business] by [appellants] contained numerous defects and hazards that violated ASTM F1918-12, the standard safety performance specification for soft contained play equipment, as presented in my audit." Short concluded that, given the number of high-level hazards identified, the "majority" of the play area required a redesign and a reinstallation to meet ASTM compliance. On cross-examination, Short acquiesced that there are no regulations in Texas that require ASTM certifications on play equipment.

### 4.    John Hampton

According to Hampton, he began Certified Value in 2001 primarily as a consulting business, but it "morphed" into a manufacturing company between 2008 and 2010, beginning with Kidsteam, an electric trackless train line. In 2010, Certified Value began manufacturing play centers, marketed towards family entertainment centers, churches, and health clubs. Hampton testified the company has completed between 150 and 200 play centers nationwide and internationally since 2010. Hampton testified that, in addition to manufacturing play systems and trains, the company also acts as "a wholesaler on

inflatables if that's what the customer would like in addition to our other products that we sell to them."

When questioned regarding the sourcing of products used for play center installations, Hampton testified that Certified Value uses "one of the largest North American rotomolding plastics manufacturers" based out of Canada for its plastic products, and China-based suppliers provide steel and all play netting. In 2015, at the time he contracted with appellee, Hampton testified Certified Value had a warehouse in Dallas, where they also did "light fabrication," and a "factory in China that [appellants] control[ed]." The factory was responsible for "stamping, welding, machining, [and] assembly work." All "in-house designers" were also based out of "the China office." Hampton maintained he was able to keep costs low by contracting out design and installation work and purchasing materials in bulk.

When asked whether Certified Value's website's statement "North American made" was misleading, Hampton testified that this statement was intended to convey that "the bulk of the cost associated with the manufacturing of this product and the installation of this product is done by North American people." Hampton admitted that, despite his website indicating in 2015 that he was a member of ASTM and the International Association for Amusement Parks and Attractions (IAAPA), his membership had lapsed for failure to pay dues. Hampton disagreed that the continued use of these logos on his website was to "convince people that [he] w[as] something that [he] w[as] not." Moreover, Hampton stated he believed ASTM standards had been followed when applicable in the design and installation of appellee's play center.

9

Hampton attributed the project start date delays to appellee, stating that appellee's final request for alterations to the design, which partly concerned alterations to the center's ceiling, occurred on the last day materials were scheduled to be transported to appellee's facility. "We already had the truck loaded and—and based on what the e-mail said[,] [I] became very concerned," said Hampton, who declined to "send the team down there" because they were "not going to be able to begin erecting the system or doing anything because now there's all these constraints on the ceiling." Hampton said it was then that he made the "decision to personally go down to the site" to unload the materials himself, conduct necessary measurements, and "regenerate" the control design documents. Hampton testified the company made no profit on this project. Hampton further stated that, contrary to Ybarra's claims, he had responded to her complaints after the project was completed and believed all outstanding issues had been resolved.

Hampton further disputed that there had been any oral contract between the parties. Hampton testified that he and appellee executed a written contract—in the form of a "Terms and Conditions of Sale" document attached to an invoice—which explicitly disclaimed the oral representations appellee asserted at trial he had made.[9] Hampton said Ybarra signed the terms and conditions and returned it to him via mail, and the document had been put in a file at his facility, but it was inadvertently "thrown out sometime before this lawsuit even started."

---

[9] The terms and conditions included a disclaimer of "any reliance on any representations, documents, statements, acts or omissions made by or through any representative, affiliate, agent, or principal of Certified Value . . . ." All modifications to the order were also subject to additional fees under the terms and conditions. Moreover, while the terms and conditions included provisions citing to the ASTM, the document only stated that Certified Value recommends purchasing items "to comply with ASTM" but indicated that "such expense is not contemplated nor included in the Order."

When asked about his countersuit, Hampton stated he sought to be "reimbursed for added expenses associated with the project." Hampton maintained he never previously requested those expenses from appellee and had never requested similar expenses from previous clients, but he thought, "Well, we might as well try to get some of these expenses back," after appellee filed suit. Hampton also sought to hold appellee accountable for sending intellectual property to his competitor, IPlayCo. "[Appellee] sent a document that basically can be reverse[] engineered from that, [to] get an understanding of our margins and our cost structure, and from that[,] since we compete in a lot of the same markets currently, they can actually effectively compete more efficiently and effectively on each bid," explained Hampton.

On cross-examination, Hampton testified that he has an educational background in finance and became familiar with worldwide distribution channels when working for a steel manufacturer. Hampton conceded he otherwise had no special training or certifications for the construction or the development of a play center, and he lacked any licensing, permitting, or experience with architectural engineers with respect to play centers.

### 5. Jeffrey Dillard & Gregory Kazel

Two former contractors for appellants also testified. Jeffrey Dillard testified he had built play centers for appellants since 2012 in connection with his business, Handy Work Services. Dillard testified he was contacted regarding appellee's project in September 2015 and traveled to Corpus Christi in October 2015 to assist in the installation. Dillard testified he was immediately informed of a protruding duct system that required a change of the play center's height configurations. Dillard testified they "had to take all the pieces

11

out and start cutting [steel]" on-site. Dillard installed "one-third to two-thirds" of the play center but was unable to complete installation, citing a medical emergency involving his wife that required him to take leave. On cross-examination, Dillard confirmed he was not a forensic architect, certified playground safety inspector, or expert on ASTM standards. Dillard testified he relied on Hampton to make sure the projects were in compliance with any applicable standards.

George Kazel, owner of GW Kazel Kid Systems, testified he took over installation after Dillard departed. Kazel stated that, in the last ten years, he has constructed "probably 150" play centers for appellants, and at least half of the systems had been "constructed internationally." Kazel, a member of the American Society of Civil Engineers, testified he also holds an amusement ride inspector license in Pennsylvania.

Kazel testified he was in Corpus Christi for "around a week" to complete the play center, and he arrived after the main steel frame had been installed. Kazel assisted in the installation of the double helix slide, train, and ball fountain. According to Kazel, it was not uncommon for appellants to receive requests from a client for repairs or modifications following an installation. "[Clients] would typically contact [Hampton] and then [Hampton] would contact either myself or . . . some other installation staff who would then go out and make the repair or do the—do the work that was needed," testified Kazel. Kazel maintained Certified Value had "never" refused a repair request from a customer in the ten years he had worked with appellants.

**B.     Judgment**

Appellants moved for a directed verdict on appellee's claims,[10] which the trial court denied. Appellee waived its causes of action for negligence, negligent hiring, and negligent misrepresentation, and the jury found in favor of appellee for its remaining claims for breach of contract, fraud, breach of warranty, and violations of the DTPA.

On June 24, 2018, the trial court entered a final judgment in favor of appellee in the amount of $119,762.03,[11] plus equitable pre-judgment interest, and reasonable attorney's fees to date in the amount of $325,000.00, plus attorney's fees of $50,000.00 for any unsuccessful appeal by appellants to the court of appeals; and $25,000.00 for any unsuccessful appeal by appellants to the Supreme Court of Texas.

On July 12, 2018, appellants, presenting substantially similar arguments as in their motion for directed verdict, filed a motion for JNOV, which the trial court denied. This appeal followed.

## II.     SUMMARY JUDGMENT

By their first issue, appellants contend that the trial court erred when it denied their partial no-evidence and traditional motions for summary judgment. However, the denial of a motion for summary judgment is not reviewable after a trial on the merits. *Schack v. Prop. Owners Ass'n of Sunset Bay*, 555 S.W.3d 339, 353–54 (Tex. App.—Corpus Christi–Edinburg 2018, pet. denied) ("Because the trial court's denial of the motion for summary judgment was followed by a trial on the merits, we cannot review the trial court's denial of

---

[10] In their motion for directed verdict, appellants argued (1) appellee was not a consumer under the DTPA and therefore could not recover under its DTPA claim; (2) appellee's fraudulent inducement claim fails because there was no executed contract; (3) appellee produced no evidence of reliance and negated reliance in its DTPA, fraud, and negligent misrepresentation claims by undertaking an independent investigation; and (4) appellee presented no evidence that appellants breached its warranty.

[11] Exemplary damages were not awarded.

13

summary judgment."); *Hines v. Comm'n for Lawyer Discipline*, 28 S.W.3d 697, 700 (Tex. App.—Corpus Christi–Edinburg 2000, no pet.) (concluding that we are without jurisdiction to review a trial court's denial of a motion for summary judgment following a trial on the merits). Here, after the trial court denied appellants' motions for summary judgment, it held a trial on the merits. Accordingly, we are unable to review the trial court's denial. *See Schack*, 555 S.W.3d at 353–54; *see also Garcia v. Perez*, No. 13-17-00673-CV, 2019 WL 2221674, at *3 (Tex. App.—Corpus Christi–Edinburg May 23, 2019, no pet.) (mem. op.). We overrule appellants' first issue.

## III. DIRECTED VERDICT & JNOV

By issue two, appellants argue the trial court erred in failing to grant its motions for directed verdict and JNOV.

### A. Standard of Review & Applicable Law

Upon a party's motion and reasonable notice, a trial court may disregard a jury verdict and render a JNOV if a directed verdict would have been proper. *See* TEX. R. CIV. P. 301; *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015). An instructed verdict for a defendant is proper when (1) a plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right to recover, or (2) the plaintiff admits or the evidence conclusively establishes a fact that establishes the movant's right to judgment as a matter of law. *Edwards v. Chevrolet*, 605 S.W.3d 219, 222 (Tex. App.—Fort Worth 2020, no pet.) (citing *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *McCullough v. Scarbrough, Medlin & Assocs., Inc.*, 435 S.W.3d 871, 884–85 (Tex. App.—Dallas 2014, pet. denied)). *Edwards*, 605 S.W.3d at 222.

14

We review a trial court's denial of a directed verdict or JNOV under a no-evidence standard, examining whether legally sufficient evidence supports the jury's findings. *Gharda USA*, 464 S.W.3d at 347. We must "'credit evidence favoring the jury verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not,'" and we will uphold the jury's finding if more than a scintilla of competent evidence supports it. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009) (quoting *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007)); *see Gharda USA*, 464 S.W.3d at 347; *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005) ("The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review.").

At trial, appellants moved for directed verdict and JNOV on appellee's DTPA, fraud, breach of contract, and breach of warranty claims.[12]

## B.     Breach of Warranty

With respect to their breach of warranty argument, appellants principally assert that, assuming arguendo that the statements on the Certified Value website created a warranty, appellee cannot recover "because it never requested that [appellants] match it."

Appellee submitted the following breach of warranty theories to the jury: (1) failure to comply with an express warranty of "any affirmation of fact or promise made by [appellants]"; (2) failure to furnish or select goods suitable for a particular purpose; and (3) failure to perform services in a good and workmanlike manner. *See Nghiem v. Sajib*, 567 S.W.3d 718, 724 n.33 (Tex. 2019) (recognizing the implied warranties in Texas,

---

[12] Appellants additionally argued in their motions that the evidence did not establish that Hampton received a direct, personal benefit from any purported perpetration of fraud; thus, he cannot be held liable under § 21.223 of the Texas Business Organizations Code. *See* TEX. BUS. & COM. CODE ANN. § 21.223. Appellants present no such independent argument on appeal.

15

which include: the implied warranty of good and workmanlike construction, the implied warranty of fitness for a particular purpose, and the implied warranty of workmanlike repairs of tangible goods or property); *Lester v. Logan*, 893 S.W.2d 570, 574 (Tex. App.—Corpus Christi–Edinburg 1994), *writ denied*, 907 S.W.2d 452 (Tex. 1995) (per curiam) (providing that implied warranty of fitness for a particular purpose applies "where a seller, at the time of contracting, has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods"). On appeal, appellants only challenge one element of appellee's breach of express warranty claim and provide no mention of appellee's implied warranty claims.

Because appellee only needs to prevail on one of its three submitted breach of warranty theories to sustain the judgment, and liability under either implied warranty theory remains unchallenged, we need not address the correctness of the trial court's conclusion on appellee's express warranty theory. *See St. John Missionary Baptist Church v. Flakes*, 595 S.W.3d 211, 213 (Tex. 2020) (per curiam) (providing that if the appellant fails to challenge all possible grounds, the reviewing court must accept the validity of the unchallenged grounds and affirm the adverse ruling); *U.S. Lawns, Inc. v. Castillo*, 347 S.W.3d 844, 846 (Tex. App.—Corpus Christi–Edinburg 2011, pet. denied); *see also Perez-Montes v. Live Oak Constr., Inc.*, No. 13-13-00674-CV, 2015 WL 2352423, at *2 (Tex. App.—Corpus Christi–Edinburg May 14, 2015, no pet.) (mem. op.) ("If an independent ground fully supports the complained-of ruling or judgment, but the appellant assigns no error to that independent ground, then (1) we must accept the validity of that unchallenged independent ground . . . ."). Similarly, we need not address

16

appellants' remaining challenges to appellee's claims for DTPA, fraud, or breach of contract where judgment in favor of appellee survives on appellee's breach of warranty claim alone. *See* TEX. R. APP. P. 47.4; *Flakes*, 595 S.W.3d at 213*; S.W. ex rel. A.W. v. Arlington Indep. Sch. Dist.*, 435 S.W.3d 414, 419 (Tex. App.—Fort Worth 2014, no pet.) ("[A]ny error in the grounds challenged on appeal is harmless because the unchallenged independent ground fully supports the complained-of ruling or judgment.").

Thus, we overrule appellants' second issue.

## IV. JURY CHARGE

By issues three and four, appellants argue the trial court abused its discretion in (1) failing to include a specific jury question on "the existence of a signed written agreement between the parties . . . as a predicate to the jury question for fraudulent inducement" and (2) including fraud as a cause of action in the jury charge when the pleadings only alleged fraudulent inducement.

The trial court has considerable discretion when determining proper jury instructions. *Gunn v. McCoy*, 554 S.W.3d 645, 675 (Tex. 2018). We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review. *Id.* (citing *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012)). An instruction is proper if it assists the jury, accurately states the law, and finds support in the pleadings and evidence. *Id.* (citing *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855–56 (Tex. 2009)). We will not reverse a judgment for a charge error unless that error was harmful because it "probably caused the rendition of an improper judgment." *See* TEX. R. APP. P. 44.1(a)(1); *Thota*, 366 S.W.3d at 687. "Charge error is generally considered harmful if it relates to a contested, critical issue." *Hawley*, 284 S.W.3d at 856;

*see Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001) ("An improper instruction is especially likely to cause an unfair trial when the trial is contested and the evidence sharply conflicting.").

## A.    Predicate Question

Here, appellants objected to the inclusion of question seven in the jury charge, which stated in part: "Did any [sic] Certified Value or John Hampton commit fraud against Infinite Play?" Appellants argue the trial court should have included a predicate question regarding the requirement of a signed, written agreement because a fraudulent inducement claim fails absent the existence of an executed written contract.[13]

Fraudulent inducement is a particular class of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof. *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018); *Haase v. Glazner,* 62 S.W.3d 795, 798 (Tex. 2001) ("Without a binding agreement, there is no detrimental reliance, and thus no fraudulent inducement claim."); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998) ("As a rule, a party is not bound by a contract procured by fraud."). Like a broader common-law fraud claim, a fraudulent-inducement claim requires proof that: (1) the defendant made a material misrepresentation; (2) the defendant knew at the time that the representation was false or lacked knowledge of its truth; (3) the defendant intended that the plaintiff should rely or act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the plaintiff's reliance on the misrepresentation caused injury. *Int'l Bus. Machines*

---

[13] It is unclear what specific instruction appellants requested. On appeal, appellants refer us to the reporter's record, wherein appellants' reference their proposed jury charge, which spans sixty-seven pages and incorporates thirty-six questions. Appellants do not specify, either at the trial court or on appeal, which question from its proposed charge it sought to precede question seven of the charge as finally submitted.

*Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019) (citing *Anderson*, 550 S.W.3d at 614).

We observe that the Texas Supreme Court has already examined whether a fraudulent inducement claim can survive when evidence at trial indicated that the binding agreement at-issue "was never reduced to writing" and "the terms of the deal [we]re disputed." *Anderson*, 550 S.W.3d at 610. The Court answered this question in the affirmative, noting that the fraudulent-inducement jury questions incorporated the necessary elements for recovery—the elements of an enforceable contract—and holding that the existence of an enforceable contract there, albeit oral, was supported by legally sufficient evidence. *Id.* at 624–25. Although "without a binding agreement, there is no detrimental reliance, and thus no fraudulent inducement claim," the binding agreement need not be written. *See id.* at 617. Thus, we are unpersuaded by appellants' assertion that appellee's fraudulent inducement claim fails without an instruction requiring evidence of a written contract.

Accordingly, the trial court did not abuse its discretion in refusing the incorporation of such instruction. *See Gunn*, 554 S.W.3d at 675 (providing that the instruction is proper if it, in part, accurately states the law). We overrule appellants' third issue.

**B.      Waiver**

In their fourth issue, appellants object to the court's inclusion of an instruction on appellee's fraud claim, which it alleges did not conform with the pleadings because appellee "did not plead fraud, but only fraudulent inducement."

To preserve error in the jury charge, the complaining party must timely and plainly make the trial court aware of the complaint and obtain a ruling. *See* TEX. R. CIV. P. 274

19

(requiring a party objecting to a charge to point out distinctly the objectionable matter and the grounds of the objection); *see also Thota,* 366 S.W.3d at 689; *Brannan Paving GP, LLC v. Pavement Markings, Inc.*, 446 S.W.3d 14, 19 (Tex. App.—Corpus Christi–Edinburg 2013, pet. denied). Moreover, to preserve error for appeal, the complaining party's argument on appeal must comport with its objection in the trial court. *Thota,* 366 S.W.3d at 689; *see* TEX. R. APP. P. 33.1. Appellants made no such objection—specific or otherwise—at the charge conference on the basis argued on appeal.[14] Therefore, appellants did not preserve this issue for our review. *See* TEX. R. APP. P. 33.1; TEX. R. CIV. P. 274. Appellants' fourth issue is overruled.

## V. EXPERT TESTIMONY

By appellants' fifth issue, appellants argue the trial court erred in admitting the testimony of appellee's expert witness because she was "not qualified and her testimony was not reliable under *Robinson*." *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995).

We review a trial court's rulings on the admissibility of evidence for an abuse of discretion, including rulings on the qualification and reliability of expert testimony. *Gharda USA,* 464 S.W.3d at 347. Qualified experts may offer opinion testimony if that testimony is both relevant and based on a reliable foundation. *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 422 (Tex. 2020). Expert opinion testimony is relevant when it is "sufficiently tied to the facts of the case [so] that it will aid the jury in resolving a factual dispute." *Id.* (quoting *Robinson*, 923 S.W.2d at 556). Although

---

[14] Appellants cite to two pages in the record wherein the objection was purportedly made, but a review of the record indicates only a challenge to the denial of appellants' request for a predicate question regarding the necessity of a written contract.

reviewing courts generally determine the reliability of an expert's chosen methodology by applying the *Robinson* factors, "[w]hether an expert's testimony is reliable is based on more than whether the expert's methodology satisfies the *Robinson* factors." *Gharda USA*, 464 S.W.3d at 348–49 (citing *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001)). Expert testimony is unreliable "if there is too great an analytical gap between the data on which the expert relies and the opinion offered." *Id.* at 349 (quoting *Volkswagen of Am., Inc. v. Ramirez,* 159 S.W.3d 897, 904–05 (Tex. 2004)). "Whether an analytical gap exists is largely determined by comparing the facts the expert relied on, the facts in the record, and the expert's ultimate opinion." *Id.*

Appellants' brief, however, provides no analysis or application of the *Robinson* factors nor does it indicate what analytical gap was present to render the expert's opinion unreliable. *See Gharda USA*, 464 S.W.3d at 348–49; *Robinson*, 923 S.W.2d at 556. Appellants instead refer this Court to its trial record filings and trial arguments on this issue.[15] Appellee asserts appellants have therefore waived this argument, and we agree. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contention made, with appropriate citations to authorities and to the record.").

"Existing legal authority applicable to the facts and the questions we are asked to address must be accurately cited and analyzed." *Goodenberger v. Ellis*, 343 S.W.3d 536,

---

[15] Appellants brief states in applicable portion:

For the reasons cited in Defendants' Objections and Reply to Plaintiff's Response for Summary Judgment Evidence, Defendant's Motion to Exclude[,] and as argued before the Court, Short's testimony was not reliable under the *Robinson* factors. As more described fully in the aforementioned portions of the record, Ms. Short: (a) admitted she was not an expert on reliance; (b) admitted she relied upon a subjective standard of care; (c) was not even certified in the applicable suggested guidelines of ASTM F-1918; (d) did not have all of the relevant information and (e) reached contradictory conclusions and failed to rule out other options.

539 (Tex. App.—Dallas 2011, pet. denied); *see* Tex. R. App. P. 38.1; *Schack*, 555 S.W.3d at 354; *Armhein v. Bollinger*, 593 S.W.3d 398, 401 (Tex. App.—Dallas 2019, pet. denied) ("The right to appellate review in Texas extends only to complaints made in accordance with our rules of appellate procedure, which require an appellant to clearly articulate the issues we will be asked to decide, to make cogent and specific arguments in support of its position . . ."). "A claim of error on appeal must be argued in the party's brief; it is insufficient simply to refer the appellate court to the party's trial court arguments." *Allen v. United of Omaha Life Ins. Co.*, 236 S.W.3d 315, 325 (Tex. App.—Fort Worth 2007, pet. denied); *Guerrero v. Tarrant Cty. Mortician Servs. Co.,* 977 S.W.2d 829, 832–33 (Tex. App.—Fort Worth 1998, pet. denied) ("Were we to approve of this tactic, appellate briefs would be reduced to a simple appellate record reference to a party's trial court arguments. Additionally, this would be an open door for parties to circumvent the appellate brief page limitations."); *see* Tex. R. App. P. 38.1; *see also State Farm Lloyds v. Vega*, No. 13-16-00090-CV, 2018 WL 1773304, at *13 (Tex. App.—Corpus Christi–Edinburg Apr. 12, 2018, no pet.) (mem. op.) (finding issue waived where appellant argued: "For the reasons outlined in Issues I, II, and III, there is legally insufficient evidence supporting the judgment on the contract, extra-contractual, and attorney fees claims"); *Gonzales v. State Farm Lloyds*, No. 13-05-00730-CV, 2006 WL 2327259, at *3 (Tex. App.—Corpus Christi–Edinburg Aug. 10, 2006, pet. denied) (mem. op.) (refusing to "incorporate arguments presented in other matters" and considering only "the contention discussed in in their brief in support"). Appellants have therefore failed to adequately brief their complaint, and this issue is waived. *See* Tex. R. App. P. 38.1; *Ellis*, 343 S.W.3d at 539. We overrule appellants' fifth issue.

## VI. CONCLUSION

We affirm the trial court's judgment.

NORA L. LONGORIA
Justice

Delivered and filed on the
4th day of February, 2021.